1   STEPHANIE M. HINDS (CABN 154284)
United States Attorney

2

THOMAS A. COLTHURST (CABN 99493)
3   Chief, Criminal Division

4   MARISSA HARRIS (NYBN 4763025)
ANNE C. HSIEH (CABN 288159)
5   SARAH E. GRISWOLD (CABN 240326)
Assistant United States Attorneys
6

7          150 Almaden Boulevard, Suite 900
San Jose, California 95113
8          Telephone: (408) 535-5061
FAX: (408) 535-5066
9          marissa.harris@usdoj.gov

10   Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14   UNITED STATES OF AMERICA,          )   **CASE NO. 16-CR-00150 BLF**
                                        )
15          Plaintiff,                  )   UNITED STATES' JOINT SENTENCING
                                        )   MEMORANDUM
16      v.                              )
                                        )   Date: September 27-28, 2022
17   ARIEL GUIZAR-CUELLAR,              )   Time: 9:00 a.m.
JOCELYN CONTRERAS,                      )
18   ARACELI MENDOZA,                   )
ALYSSA ANTHONY,                         )
19                                      )
                                        )
20          Defendants.                 )

21

22

23

24

25

26

27

28

U.S. JOINT SENT. MEMO.
16-CR-00150 BLF

1

## TABLE OF CONTENTS

2  I.     FACTUAL AND PROCEDURAL BACKGROUND...................................................1

3         A.     Victim B.M. ...........................................................................................1

4         B.     Victim J.B. .............................................................................................4

5         C.     Victim J.V. .............................................................................................6

6         D.     Subsequent Conduct in Orange County ...................................................9

7         E.     Resolutions in the Federal Case ..............................................................9

8         F.     Mendoza's Trial and Conviction .............................................................9

9  II.    PRESENTENCE REPORTS .............................................................................11

10 III.   CALCULATION OF RESTITUTION .................................................................11

11        A.     Victim B.M. .........................................................................................11

12        B.     Victim J.B. ...........................................................................................13

13        C.     Victim J.V. ...........................................................................................13

14 IV.    GOVERNMENT'S POSITION ON REMAND ....................................................13

15 V.     SENTENCING RECOMMENDATIONS .............................................................16

16        A.     Alyssa Anthony.....................................................................................19

17        B.     Jocelyn Contreras...................................................................................20

18        C.     Araceli Mendoza ...................................................................................22

19        D.     Ariel Guizar-Cuellar ..............................................................................23

20 VI.    CONCLUSION...............................................................................................25

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ........................................................ 24

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................................. 16, 24

*United States v. Burnett*, 76 F.Supp.2d 846 (E.D. Tenn. 1999) ............................................ 15

*United States v. Christman*, 712 F.Supp.2d 651 (E.D. Ky. 2010) ........................................ 15

*United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984) .................................. 16, 23

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003) ................................................ 14, 15

*United States v. Green*, 250 F.Supp.2d 1145 (E.D. Mo. 2003) ............................................ 15

*United States v. Koon*, 6 F.3d 561 (9th Cir. 1993) ............................................................. 14

*United States v. Walls*, 784 F.3d 543 (9th Cir. 2015) ....................................................... 16

*United States v. Webster*, 2011 U.S. App. LEXIS 26438 *1, 9 (9th Cir. 2011) ..................... 11

*United States v. Williams*, 5 F.4th 1295 (11th Cir. 2021) ....................................... 11, 12, 13

**Statutes**

18 U.S.C. § 242 ............................................................................................................ 14

18 U.S.C. § 371 ............................................................................................................ 22

18 U.S.C. § 1591 ............................................................................................... 14, 16, 22

18 U.S.C. § 1593 ............................................................................................................ 11

18 U.S.C. § 1594 ................................................................................................... 9, 20, 21

18 U.S.C. § 3143 ..................................................................................................... 14, 16

18 U.S.C. § 3145 ..................................................................................................... 14, 15

18 U.S.C. § 3553 ...................................................................................................... *passim*

22 U.S.C. § 7101 ............................................................................................................ 16

29 U.S.C. § 201 ............................................................................................................. 11

**Other**

USSG § 3D1.2 comment .................................................................................................. 11

USSG § 5K1.1 ............................................................................................................... 22

USSG § 5K2.12 .............................................................................................................. 23

Plaintiff United States of America, by and through its undersigned counsel, hereby submits its position regarding the sentencing of the defendants, Ariel Guizar-Cuellar, Jocelyn Contreras, Araceli Mendoza, and Alyssa Anthony.  The government's position is based on its investigation, the Presentence Reports ("PSR"), the files and records of this case, the victim impact statements submitted to date, and any arguments or testimony to be presented at the sentencing hearings.  For the reasons detailed below, the government requests that the Court impose sentences consistent with its recommendations, which are sufficient, but not greater than necessary to meet the goals of sentencing expressed in 18 U.S.C. § 3553(a).

## I.       FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an FBI investigation concerning Ariel Guizar-Cuellar ("Guizar-Cuellar"), Jocelyn Alvarez Contreras ("Contreras"), Araceli Mendoza ("Mendoza") and Alyssa Anthony ("Anthony"), and their association with three female minors: "B.M.," born in 1998, "J.B.," born in 1999, and "J.V.," born in 1999.  Guizar-Cuellar, together with Contreras, Anthony, and Mendoza engaged in sex trafficking of these minor victims for financial gain.  The acts charged in the initial indictment happened between late 2014 and early 2016.  Guizar-Cuellar was the leader of this enterprise and Contreras, Anthony, and Mendoza all worked as his "bottom girls" at various times.  In their capacity as bottom girls, the three women arranged dates for the minors, created and posted online prostitution advertisements, corresponded with potential clients, transported the minors to and from the dates, secured hotel rooms for prostitution purposes, provided condoms and drugs to the minors, collected money from the minors after the prostitution dates, and arranged for the minors to engage in other commercially profitable sexual exploitation (such as exotic dancing).  Contreras and Mendoza were with the prostitution ring for the entirety of the conspiracy period and managed all three minor victims.  Anthony was there for only a few months and primarily interacted with B.M., as opposed to the other victims.

### A.       Victim B.M.

Victim B.M. was from Modesto, California.  She first met Guizar-Cuellar, aka "Shy," through Instagram in roughly 2014.  Guizar-Cuellar's Instagram handles were "boss_shy" and "sharkcity_shy." He would comment on B.M.'s pictures and they became Instagram friends.  After their initial chats, B.M. met with Guizar-Cuellar once in late 2013 in Long Beach, and again in September 2014 in San Jose.  B.M. came to San Jose because Guizar-Cuellar wanted some girls to accompany him to Las Vegas for his

birthday.  After B.M. arrived, Guizar-Cuellar talked to her about "working."  This was not the first conversation they had had about "working." B.M. knew "working" meant to engage in prostitution-like activities and agreed to work for Guizar-Cuellar.

B.M. ended up having four or five dates over two days during the first trip to San Jose in September 2014, all at the Motel 6 off Tully Road.  All of these dates were with older men who paid her for vaginal sex.  She was 16 years-old at the time.  Contreras and Mendoza created ads on Backpage.com and corresponded with B.M.'s potential clients.  Mendoza and Guizar-Cuellar would collect the money after B.M.'s dates.  Guizar-Cuellar refused to let B.M. leave until she met his profit quota.  He threatened to "rob her for the rest of her life" if she tried to work on her own.  After that, B.M. fled to her cousin's home in San Jose and got a ride back to Modesto.

After she left San Jose in September 2014, B.M. began living at a group home in Long Beach. Guizar-Cuellar, Contreras, and Mendoza continued communicating with B.M., saying they missed her and encouraging her to come back to San Jose to work with them again.  B.M. wavered on going back to San Jose.  She told Guizar-Cuellar that she needed money and Guizar-Cuellar offered to pick her up from the group home several times.  Guizar-Cuellar eventually became frustrated and said he'd give her one last chance if she found her own way to San Jose and worked hard.

B.M. got a ride to San Jose and worked for Guizar-Cuellar from approximately early March 2015 until June 2015.  A Backpage advertisement created by Mendoza's account on March 4, 2015 features numerous pornographic pictures of B.M. and was reposted over 30 times from March 4, 2015 to May 23, 2015.  *See* Gov. Ex. 29.[1]  A second advertisement was created and posted on April 17, 2015 and features B.M. and Anthony.  *See* Gov. Ex. 32.  Contreras and Anthony took the pictures for the ad.  *See* ECF No. 164 at 4; ECF No. 251 at 3.   In the beginning, B.M. had about 15-20 dates a day in various hotels in the San Jose area including the Days Inn in Sunnyvale, the Super 8 on the Alameda, the Best Western on Tully Road, the Clarion on Monterey Road, and the Marriott in Santa Clara.  The dates were arranged through Backpage.com by Contreras and Anthony.  B.M. would give Contreras the money after each date. Contreras set B.M.'s rates.  B.M. estimated that she made approximately $1,000 a day engaging in

[1] All citations to "Gov. Ex." refer to the Government's offered or admitted trial exhibits.  Citations to "Sent. Ex." refer to sentencing exhibits filed with this memorandum.

prostitution activity.  *See* CUELLAR-039926.  B.M. did not receive any of the money that she made from her dates.  Mendoza later confirmed this $1,000 a day estimate.  *See* Gov. Ex. 24 (Clip 19).  Guizar-Cuellar also encouraged B.M. to forego using condoms because she would make more money by offering "bare back" sex.  *See id*.

However, as the months progressed, B.M. had fewer and fewer dates.  This was due to her increasing use of methamphetamine, supplied by Guizar-Cuellar to help B.M. stay awake.  If she fell asleep in the hotel room, she got in trouble and was told to sleep in the car.  Guizar-Cuellar also gave B.M. acid, cocaine, and "pills" during this time.  B.M. recalled becoming cranky, paranoid, sleep-deprived, and hungry.  Guizar-Cuellar started antagonizing her because of her decline in productivity due to drug use.  They fell out after B.M. complained about her treatment and said she wanted to leave.  Guizar-Cuellar kicked her out of the hotel room and did not let her take any of her things.  One of the group then drove her back to Modesto.

After B.M. left San Jose, she traded hostile messages on Facebook and Instagram with Guizar-Cuellar after he bad-mouthed her online.  *See, e.g.*, Gov. Exs. 10, 12c, 12e.  She later got a message from Anthony's Facebook account saying that a "green light" was out on her (meaning that someone could be sent to kill her).  B.M.'s hostile response is captured in Government's Exhibit 12e.   In late June 2015, Mendoza and Anthony posted a video of B.M. having sexual intercourse with a client on Snapchat and Instagram.  *See* Gov. Exs. 22a, 22b, 22c.  The video was taken in a hotel room around May 2015 by Guizar-Cuellar's hidden camera.  B.M. was 17 years-old when the videos were created and when they were distributed online by Mendoza and Anthony.  The videos also featured cruel takedowns of B.M. by Guizar-Cuellar, Mendoza, and Anthony—body shaming B.M., ridiculing B.M. for her drug addiction and poor health (B.M. had Type I Diabetes), and calling her "bitch," "fat-ass," and "tweaker."  After the video was posted, B.M. wrote on Instagram that Guizar-Cuellar hired underage girls to work for him and was physically abusive to the women and girls in his orbit.  *See* Gov. Ex. 12e.  Anthony and Mendoza publicly denied any abuse on Instagram.  *See* Gov. Exs. 19a, 20l.

On August 6, 2015, B.M. testified before a federal grand jury and her testimony was consistent with the facts stated above.  She left home again in early September 2015 and engaged in additional prostitution activities on behalf of Guizar-Cuellar and Mendoza.  She was located on October 6, 2015,

1  when Sunnyvale police arrested Guizar-Cuellar in the parking lot of a Days Inn for narcotics sales.  Guizar-

2  Cuellar consented to a search of his vehicle and officers seized multiple laptops, iPhones, and digital media

3  devices inside the vehicle.  The electronic devices were later analyzed pursuant to a federal search warrant

4  and agents found the video of B.M. that was posted to Snapchat on a USB drive.  Officers searched a room

5  connected with a room key found in Guizar-Cuellar's pocket.  The room was rented by Mendoza.  Officers

6  found B.M. inside the room with indicia of prostitution, including price lists, condoms (used and unused),

7  medication to treat sexually transmitted diseases, and insulin for injection.  *See* Gov. Exs. 40-57.  B.M.

8  was still 17 years-old at the time.

9      In February 2016, B.M. called FBI Special Agent Ann Trombetta and revealed that she worked

10  for Guizar-Cuellar again in November 2015 in Reno, Nevada, Lathrop, California, and San Jose,

11  California.  B.M. was also hospitalized during this time because of her health problems.  *See* Gov. Exs.

12  56, 57.  She next worked with Guizar-Cuellar, Contreras, and Mendoza in Los Angeles during January

13  and February of 2016.  Guizar-Cuellar became more violent during this time.  B.M. said that Guizar-

14  Cuellar beat her, Contreras, and Mendoza.  He acquired a gun and threatened to shoot her.  He continued

15  to give her methamphetamine and take her possessions.  She finally left him on February 7, 2016, the day

16  before he and Mendoza were arrested and charged in Orange County for sex trafficking adult and minor

17  victims, including B.M.  B.M. subsequently gave a recorded interview to Fox 11 news about her

18  experiences. *See* CUELLAR-000001.

19      B.M. died in June 2021, apparently by suicide.  She left letters and poems citing her trafficking,

20  drug addiction, and Guizar-Cuellar's violence as factors contributing to her profound sense of despair.

21  *See* CUELLAR-039923-27.  These letters and poems are submitted as victim impact statements for B.M.

22  *See* Sent. Ex. E.  B.M.'s mother also submitted a written statement which was forwarded to Probation and

23  filed with this memorandum.  *See* Sent. Ex. A.  B.M.'s surviving family members, attorneys, and friends

24  will attend the sentencing hearing and may address the Court in person.

25      **B.    Victim J.B.**

26      Victim J.B. is from San Jose, California.  On April 20, 2015, J.B.'s mother, Rachel N., contacted

27  the San Jose Police Department ("SJPD") to report an online prostitution advertisement containing photos

28  of J.B.  *See* Gov. Ex. 31.  J.B. was interviewed by SJPD and the FBI and indicated that Guizar-Cuellar

had turned her to prostitution.

Guizar-Cuellar first contacted J.B. through her Instagram account in late 2014. Guizar-Cuellar sent J.B. a friend request, to which J.B. did not respond. In early 2015, Guizar-Cuellar posted a picture of money on his Instagram account "boss_shy" and wrote that any females who wanted to make money should direct message him. *See, e.g.*, Gov. Exs. 11a, 11b. J.B. accepted Guizar-Cuellar's friend request and in March 2015 she messaged him to "put her on," which means to work as a prostitute. *See* Gov. Ex. 11k. At the time, J.B. was 15 years-old and a high school student.

J.B. later met up with Guizar-Cuellar, Contreras, and Mendoza at his tattoo shop. Tr. Vol. 2 at 319-21. That same day, J.B. had prostitution dates on their behalf at the Super 8 hotel in San Jose. *Id.* at 322-23. Contreras and Mendoza took several provocative pictures of her and posted a prostitution advertisement on Backpage.com. *See id.* at 323-34; Gov. Ex. 31. The ad was first posted on April 1, 2015 using Mendoza's Backpage account, which was linked to her phone and funded using Bitcoin. *See id.*; Gov. Exs. 39, 24 (Clip 31). J.B.'s ad was reposted at least eight times throughout April 2015. She appears in a second Backpage ad with Anthony posted by the same account. *See* Gov. Ex. 33. J.B. worked as a prostitute sporadically from March to August 2015. *See id.*; Tr. Vol. 2 at 358-64; Gov. Ex. 20m. During this time, Contreras and Mendoza were primarily responsible for arranging and managing her prostitution dates and transporting her to hotel rooms purchased by all four defendants. *See* Tr. Vol. 2 at 335-48; Gov. Exs. 5-9, 27.

J.B. remembers working at the Super 8, Clarion, Marriott, and the Fontaine Inn. All of J.B.'s dates were in San Jose or Santa Clara. She estimated that she went on approximately 30 prostitution dates total in March-April 2015 and less than 10 dates in August 2015. *See* Tr. Vol. 2 at 345, 363. Almost all of the money J.B. earned was given to Guizar-Cuellar. During her FBI interview, J.B. estimated that Guizar-Cuellar gave her approximately $500-$600 out of the approximately $6,000-$9,000 that she earned. J.B. did not confront Guizar-Cuellar about the discrepancy because she feared him. J.B. witnessed Guizar-Cuellar slap Mendoza once and recalled that he was constantly yelling.

J.B. received methamphetamine, marijuana, alcohol, and Adderall from Guizar-Cuellar. *See* Tr. Vol. 2 at 345-46. Guizar-Cuellar also tattooed an image of red lips with a shark in the middle of J.B.'s buttocks. *See* Gov. Exs. 31, 12a. At trial, J.B. described this image as a brand that Guizar-Cuellar placed

1    on the females who worked for him.  She later got the tattoo covered up because she "didn't ever want to

2    look at it, have to look at it again."  Tr. Vol. 2 at 387-88.  It is now a pink rose.  *Id.*

3         At Mendoza's trial, J.B. identified B.M. as another underage girl doing prostitution dates for

4    Guizar-Cuellar while J.B. was with the venture in 2015.  *Id.* at 376-80.  She identified B.M.'s photo from

5    Government's Exhibit 29, a Backpage prostitution advertisement posted by the same account Mendoza

6    used to post J.B.'s ads.  J.B. also identified B.M. in Government's Exhibits 22a, 22b, and 22c, which are

7    child pornography videos showing B.M. having sex with a client in a hotel room and identified the voices

8    of Mendoza and Anthony repeatedly ridiculing B.M. in vindictive commentary during the videos.  Tr.

9    Vol. 3 at 472-76.  Mendoza and Anthony posted and distributed the child pornography and commentary

10    on Snapchat and Instagram.

11         As a result of her trafficking, J.B. became estranged from her family, who were "furious, upset,

12    and disappointed" once they found out.  *See* Tr. Vol. 2 at 383-84.  She was emotionally harmed and

13    embarrassed by what happened to her and feels "like shit" to this day because of her exploitation at the

14    defendants' hands.  *Id.*  She had to withdraw from high school, which delayed her education.  She

15    eventually enrolled in a youth boot camp in San Luis Obispo.  She took up running to cope with her

16    trauma.  *Id.* at 386-87.  She eventually finished high school and now works as a security guard.  *Id.* at 387.

17         J.B. and her mother have provided victim impact statements, which were forwarded to Probation

18    and are filed with this memorandum.  *See* Sent. Exs. B, C.  They will attend the joint sentencing hearing

19    to address the Court in person.

20         **C.**    <u>**Victim J.V.**</u>

21         Victim J.V. is from Atwater, California.  J.V. first became involved with the defendants in June

22    2015 at age 15 after meeting Guizar-Cuellar on social media.  Tr. Vol. 2 at 190.  Prior to that time, she

23    followed some of Guizar-Cuellar's accounts on Snapchat and Instagram.  *Id.*  About a week later, Guizar-

24    Cuellar contacted J.V. and asked her to hang out.  *Id.*  She agreed, and Guizar-Cuellar picked up J.V. and

25    some other girls from Turlock, Merced, and Atwater and drove them all to San Jose.  *Id.*  at 191-92.

26         During the car ride, Guizar-Cuellar explained that the girls would be "escorting," which he

27    described as hanging out with guys "like a date."  *Id.* at 192-93.  J.V. did not understand from this

28    explanation that she would be expected to have sex with anyone.  *Id.*  Guizar-Cuellar heard J.V. tell another

girl that she was 17 years-old and Guizar-Cuellar told her not to tell anyone else her age.  *Id*. at 194.  Guizar-Cuellar took the girls to a Best Western in San Jose, where Contreras and Mendoza were also staying.  *Id*. at 195-96.  Mendoza got a second hotel room, where Guizar-Cuellar took provocative pictures of J.V. in her underwear for Backpage ads and had non-consensual sex with her.  *Id*. at 196-99.  J.V. was put to work doing prostitution dates shortly thereafter.

During the two-day trip to San Jose in June 2015, J.V. had between five and ten prostitution dates for money at the Best Western and Super 8.  *Id*. at 199-203.  J.V. identified Contreras and Mendoza as bottom girls who worked for Guizar-Cuellar and facilitated her prostitution dates by setting up her Backpage account, taking provocative pictures of her, posting prostitution advertisements, setting up her dates with customers, collecting the money she earned on the dates, and transporting her to the hotels where the dates occurred.  *See id*. at 205-11.  J.V. made approximately $500 in June 2015, almost all of which went to Guizar-Cuellar.  *Id*. at 214.  J.V. also used cocaine given to her by Mendoza.  *Id*.  Eventually, Guizar-Cuellar got J.V. addicted to methamphetamine.  *Id*. at 220, 232-33.   J.V. began receiving calls from her family to come home.  Her parents reported her missing and posted a Facebook notice with her picture and true age, which went viral.  *Id*. at 209-10.  Guizar-Cuellar saw the notice and showed everyone else staying with them, including Contreras and Mendoza.  *Id*.  J.V. left soon after that, and her aunt drove her back to Atwater.  *Id*. at 215.

A few months later, in September 2015, J.V. received several calls and texts from Mendoza and Guizar-Cuellar asking her to come back to San Jose and work.  *Id*. at 215-16.  J.V. told Guizar-Cuellar that she no longer wanted to have dates.  Guizar-Cuellar told her that she could "dance" instead, which turned out to be a lie.  *Id*.  J.V. returned to San Jose, and Mendoza took her and another female to the Super 8 in San Jose to engage in prostitution.  *Id*. at 217-20.  Mendoza took provocative pictures of J.V. in lingerie and posted an ad for her on Backpage.  *Id*.   During this time, J.V. answered ads but didn't try hard to schedule any dates.  *Id*.  Guizar-Cuellar did not allow her to eat or sleep because she wasn't making enough money.  Instead, Guizar-Cuellar gave J.V. methamphetamine to keep her awake.  *Id*. at 220.

J.V. stayed with Guizar-Cuellar and the others for about a week.  They went to two more hotels in San Jose and J.V. did eventually have more dates to earn money in order to eat and stay at the hotel.   J.V. estimated that she had another seven prostitution dates at the Fontaine Inn based on Backpage ads that

Mendoza posted. *Id*. at 226-27. Guizar-Cuellar gave her methamphetamine to help her stay awake. She made approximately $1,000 and was only allowed to go home after agreeing to falsely admit guilt for one of Guizar-Cuellar's drug cases. *Id*. at 229-31. After J.V. got home, she suffered withdrawal from the methamphetamine that Guizar-Cuellar had given her. She got into a fight with her mother, who then called the police. *Id*. at 232-33. She was arrested and taken to juvenile hall. She was placed on probation and given an ankle monitor upon release. *See id*. She informed Guizar-Cuellar of her situation and he continued to insist that J.V. take responsibility for his drug charge. *Id*. at 234.

J.V. came back to San Jose a third time in December 2015, where Mendoza arranged for her to work at two San Jose strip clubs. *Id*. at 235-38. J.V. earned approximately $800-900 each day doing lap dances, approximately 40-50 lap dances a day. *Id*. J.V. made about $5,000 total and was there for less than a week. *Id*. at 239. She never got any of the money. *Id*. J.V. identified B.M. as a 17-year-old girl doing prostitution dates for Guizar-Cuellar while J.V. was in San Jose in December 2015. *Id*. at 239-44; Gov. Ex. 29. After returning home to Atwater, J.V. was arrested for violating her probation and spent time in custody. *Id*. at 245.

As a result of her trafficking, J.V. had to quit school. *Id*. at 248. She became addicted to Guizar-Cuellar's methamphetamine and incurred a criminal record because of her behavior under the influence of methamphetamine withdrawal. She was incarcerated. She witnessed Guizar-Cuellar slap and hit Contreras and Mendoza. She was in therapy for a year, which helped her cope with some of the trauma from her experience, though she continues to suffer from anxiety and depression. *Id*. at 248-50. She never received any of the money she made. *Id*. She was estranged from her mother for several years "because she couldn't see me as her little girl anymore" after she was repeatedly sexually exploited by the defendants in this case. *Id*. at 251. She blames Guizar-Cuellar, Contreras, and Mendoza for her exploitation and the negative impact on her life: "They were all older than me. They knew my age. They knew what I was doing there." *Id*. at 252.

The government did not receive a separate victim impact statement from J.V., however J.V.'s above-described trial testimony explains the negative impact of these crimes on her and her family. The government has made diligent efforts to notify J.V. and her family about the sentencing hearing and will notify the Court if they elect to attend.

### D.    Subsequent Conduct in Orange County

Guizar-Cuellar, Mendoza, and Contreras subsequently traveled to Orange County, California in February 2016 to engage in additional prostitution and sexual exploitation.  All three were arrested and charged with conspiracy and sex trafficking offenses by state prosecutors in Orange County.  The federal indictment issued shortly thereafter on April 7, 2016.

Guizar-Cuellar pleaded guilty to 17 felonies (including human trafficking and forcible rape) and was sentenced to an aggregate of 32 years in state prison.  *See* Guizar-Cuellar PSR ¶ 107.  The government has received a victim impact statement from E.T., the 15-year-old victim in that case, and files that statement for the Court's consideration under 18 U.S.C. § 3553(a).  *See* Sent. Ex. D.  E.T. may attend the sentencing hearing and may wish to address the Court.

Contreras pleaded guilty to three felony counts: conspiracy to commit pimping, conspiracy to commit pandering, and conspiracy to destroy evidence.  She was sentenced to eight years in state prison, which was suspended.  Contreras cooperated with the state and was placed on supervised probation for five years and given credit for jail time served (430 days).

Mendoza pleaded guilty to one felony count of conspiracy to commit pandering and was sentenced to six years in state prison, which was suspended.  Mendoza cooperated with the state and was placed on formal probation for five years and given credit for jail time served (430 days).  The DDA who prosecuted the case has since provided a letter indicating that Mendoza was a victim of human trafficking.  Guizar-Cuellar pleaded guilty to a separate trafficking count listing her as a victim.

### E.    Resolutions in the Federal Case

On May 7, 2019, Guizar-Cuellar pleaded guilty to all charges in the federal indictment.  *See* ECF No. 144.  On September 4, 2019, Contreras pleaded guilty to a superseding information charging her with Conspiracy to Commit Sex Trafficking of Children, in violation of 18 U.S.C. § 1594(c).  *See* ECF No. 164.  On July 21, 2020, Anthony also pleaded guilty to a superseding information charging her with violating § 1594(c).  *See* ECF No. 251.  Mendoza proceeded to trial, asserting a duress defense.

### F.    Mendoza's Trial and Conviction

Trial in Mendoza's case began in earnest on September 14, 2021.  The government presented testimony from ten witnesses, and numerous photographs, recordings, social media records, and

1   documents in support of its case.  Victims J.B. and J.B. testified as indicated above.  B.M. died three

2   months before trial and did not testify.  The government's remaining witnesses were various law

3   enforcement officers who investigated the defendants' sex trafficking conspiracy at various times.

4   Through these witnesses, the government introduced numerous corroborating records demonstrating the

5   mechanics of the prostitution ring, including hotel records, Backpage ads, photographs, and videos

6   showing where, when, and how it operated as well as the defendants' clear culpability for facilitating it.

7   *See, e.g.*, Gov. Exs. 5-9, 27, 22a, 22b, 22c, 24, 28-36, 39-57.  The government also introduced numerous

8   Instagram posts and recorded statements showing Mendoza's eagerness to make money, enjoyment of her

9   lifestyle, pleasure in her romantic relationship with Guizar-Cuellar, repeated efforts to bail him out of jail,

10  and general lack of duress during the relevant time period.  *See, e.g.*, Gov. Exs. 20a-20x, 36.

11      The defense called seven witnesses, including three expert witnesses, and admitted various

12  photographs and recordings in support of Mendoza's duress claims.  The primary witness was Mendoza

13  herself, who repeatedly denied any and all responsibility for the facilitation of any sex trafficking

14  activities.  *See* Tr. Vol 5 at 879-988.  The government robustly cross-examined Mendoza, confronting her

15  with several dozen video clips taken directly from her 2017 joint state and federal proffer where she calmly

16  admitted her willing participation in the trafficking of all three minor victims, her operation of the

17  Backpage accounts used to advertise them, her posting and sharing of a video of B.M. being sex trafficked,

18  and her repeated efforts to support Guizar-Cuellar throughout the conspiracy in Northern California, along

19  with her actual conviction for conspiring with him and Contreras to traffic women in Southern California.

20  *See id.* at 989-1013, Tr. Vol. 6 at 1024-48; Gov. Exs. 23, 24. These proffer clips clearly and definitively

21  contradicted Mendoza's emotional denials during her direct examination.

22      The government called Contreras as a rebuttal witness to challenge many of Mendoza's claims,

23  including claims that she had no reasonable opportunity to escape Guizar-Cuellar over the course of a 16-

24  month conspiracy.  The jury ultimately credited Contreras' testimony.  On October 6, 2021, after eight

25  days of deliberation, the jury returned unanimous guilty verdicts on Counts One (Conspiracy to Commit

26  Sex Trafficking of B.M., J.B., and J.V.) and Two (Sex Trafficking of B.M.).  The jury hung on Count

27  Three (Sex Trafficking of J.B.) and acquitted on Count Four (Sex Trafficking of J.V.).  The government

28  later dismissed Count Three, electing to proceed to sentencing on the two unanimous convictions.

## II.      PRESENTENCE REPORTS

The government has reviewed the various PSRs prepared in this case.  The government submitted fulsome objection letters for all four draft PSRs.  The government's objections were mostly resolved in the final versions released.  With respect to Guizar-Cuellar's PSR, the government reads USSG § 3D1.2 comment notes 2, 3, and 4 to require grouping Count Five (Production of Child Pornography as to B.M.) with Counts One (Conspiracy) and Two (Sex Trafficking of B.M.). The creation and distribution of the video of B.M. engaged in sexual intercourse with a prostitution client was listed as an act in furtherance of the conspiracy (*see* ECF No. 144 ¶ 2(k)-(l)) and depicts B.M. being sex trafficked, which is charged in Count Two.  The government takes no position on the inclusion of enhancements for undue influence over the minor victims (Guizar-Cuellar PSR ¶¶ 62, 70, 78) and repeat and dangerous sex offender (Guizar-Cuellar PSR ¶ 93) consistent with its agreements in Guizar-Cuellar's plea.  The government submits E.T.'s victim statement for consideration as relevant to the sentencing factors articulated in 18 U.S.C. § 3553(a).

## III.      CALCULATION OF RESTITUTION

Restitution is mandatory to all three minor victims, pursuant to 18 U.S.C. §§ 1593 and 2259. Victims of human trafficking are entitled to mandatory restitution for "the full amount of the victim's losses," which shall include "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. § 201 et seq.)." *See* 18 U.S.C. §§ 1593(a) and (b)(3). "The statutory language is clear that mandatory restitution includes not only the victims' actual losses, but also the defendant's ill-gotten gains." *See United States v. Webster*, 2011 U.S. App. LEXIS 26438 *1, 9 (9th Cir. 2011) (citing § 1593(b)(3)).  The district court need only estimate, based on facts in the record, the victims' losses "with some reasonable certainty." *See id.* (citing *United States v. Doe*, 488 F.3d 1154, 1160 (9th Cir. 2007)).  *See also United States v. Williams*, 5 F.4th 1295, 1305 (11th Cir. 2021) (affirming district court's calculation of sex trafficking restitution by multiplying each victim's average daily earnings by the number of days she prostituted).

### A.      Victim B.M.

B.M. worked for the defendants numerous times during the federal conspiracy period.  She has repeatedly indicated that she earned approximately $1,000 each day she worked, which was Guizar-

1  Cuellar's quota for her.  *See, e.g.*, Sent. Ex. E.  Mendoza confirmed the thousand-dollar-a-day estimate in

2  her video-recorded proffer.  *See* Gov. Ex. 24 (Clip 19).  B.M. never received any of the money she earned.

3  In September 2014, B.M. estimated that she went on approximately five prostitution dates over

4  two days.  B.M. is therefore owed approximately $2,000 in restitution for these two days of work.

5  B.M. returned to the conspiracy in the spring of 2015.  B.M. testified that she went on

6  approximately 15-20 dates a day charging a variable rate based on how much time the client spent with

7  her.  *See* CUELLAR-036716-19.  She later reaffirmed that she made about $1,000 each day.  Sent. Ex. E.

8  Government's Exhibit 29 is a Backpage advertisement for B.M.  This ad was reposted 31 times between

9  March 4, 2015 and May 23, 2015 on 21 different days.  B.M. is therefore owed approximately $21,000 in

10  restitution for these 21 days of work.

11  Government Exhibit 32 is a Backpage advertisement for B.M. which was posted on April 17, 2015.

12  B.M. is therefore owed approximately $1,000 in restitution for this day of work.

13  On October 6, 2015, B.M. was recovered at the Days Inn in Sunnyvale, CA.  According to her

14  interview with the FBI, she had been with Guizar-Cuellar for "a few days" before being discovered inside

15  the hotel room with a prostitution price list and condoms (used and unused).  *See* CUELLAR-003203.

16  B.M. is therefore owed approximately $3,000 in restitution for these "few" days of work.

17  In November 2015, B.M. disclosed to the FBI that she also worked "one date" over Thanksgiving

18  weekend in November 2015 while in Reno, NV after Contreras posted advertisements for her.

19  CUELLAR-005941.  She returned to San Jose for "a few weeks," where she engaged in prostitution with

20  Guizar-Cuellar, with Mendoza or Contreras posting advertisements for her.  *Id*.  She then went to Lathrop,

21  CA and engaged in prostitution for "a few nights."  B.M. was also hospitalized during this period due to

22  her health problems.  *Id*.  J.V. recalled B.M. doing prostitution dates while she was with the conspiracy in

23  December 2015.  The government will therefore estimate that B.M. worked approximately 23 days and is

24  owed approximately $23,000 in restitution for her work from late November 2015 to January 2016.

25  Accordingly, a minimum of $50,000 in restitution should be paid to B.M.'s estate or her heirs as

26  restitution for lost prostitution earnings under § 1593.  B.M. may have additional qualifying expenses,

27  such as medical treatment and legal fees.

28  ]

**B.**   **Victim J.B.**

J.B. estimated that she went on about approximately 30 prostitution dates from March to April 2015.  She also recalls engaging in fewer than 10 prostitution dates in August 2015, where she earned about $500.  *See* Tr. Vol. 2 at 345, 363.  Government's Exhibit 31 is a Backpage advertisement for J.B. which was reposted eight times between March 1, 2015 and April 20, 2015 on five different days. Government's Exhibit 33 is a Backpage advertisement for J.B. which was posted once on April 20, 2015. During her FBI interview, J.B. estimated that Guizar-Cuellar gave her in total approximately $500-$600 out of the approximately $6,000-$9,000 that J.B. earned from commercial sex work during the conspiracy.

Accordingly, multiplying 30 dates by the highest rate posted in the two advertisements ($280) equals $8,400 for the March to April 2015 period.  We add $500 for the August 2015 dates for a total of $8,900.  We subtract the $500 that J.B. estimates she received, for a minimum restitution amount of $8,400.  J.B. may also have additional qualifying expenses, such as medical treatment and legal fees.

**C.**   **Victim J.V.**

In June 2015, J.V. worked for two days and made approximately $500 doing prostitution dates, almost all of which went to Guizar-Cuellar.  Tr. Vol. 2 at 214.

In September 2015, J.V. estimated that she had another seven prostitution dates at the Fontaine Inn based on Backpage ads that Mendoza posted.  *Id*. at 226-27.  J.V. worked for about a week and made approximately $1,000.

In December 2015, J.V. came back to San Jose a third time and Mendoza arranged for her to work at two San Jose strip clubs.  *Id*.at 235-38.  J.V. earned approximately $800-900 each day doing lap dances, approximately 40-50 lap dances a day.  *Id*.  J.V. made about $5,000 total and was there for less than a week.  *Id*. at 239.  She never got any of the money.  *Id*.

Accordingly, J.V. is owed a minimum of $6,500 in restitution.  She may have additional qualifying expenses, such as medical treatment and legal fees.

**IV.**   **GOVERNMENT'S POSITION ON REMAND**

Mendoza has moved for continued release pending her appeal.  ECF No. 595.  Pursuant to 18 U.S.C. § 3143(b)(2), a judicial officer shall order that a defendant convicted of sex trafficking of children, in violation of 18 U.S.C. § 1591, and sentenced to a term of imprisonment be detained pending a filed

1  appeal.  *See* 18 U.S.C. § 3143(b)(2).  However, a person subject to mandatory remand under § 3143(b)(2)

2  who otherwise meets the requirements of § 3143(a)(1) may be ordered released "if it is clearly shown that

3  there are exceptional reasons why such person's detention would not be appropriate."  *See* 18 U.S.C. §

4  3145(c).

5          There is no consensus on the precise meaning of "exceptional reasons" under § 3145(c), but the

6  two published Ninth Circuit decisions addressing this issue indicate that common and foreseeable

7  hardships typically associated with incarceration do not qualify as "exceptional" under the statute.  First,

8  in *United States v. Koon*, the Ninth Circuit denied petitions for *en banc* review of a panel's denials of post-

9  conviction release for two police officers appealing convictions under 18 U.S.C. § 242 for criminal civil

10  rights violations.  *See* 6 F.3d 561, 562 (9th Cir. 1993).  In a concurring opinion, Judge Rymer indicated

11  that "exceptional" means "out of the ordinary, uncommon, or rare," and nothing about the circumstances

12  advanced by the defendants in that case "sets them apart from anyone else convicted of a crime of

13  violence" facing mandatory post-conviction remand pursuant to § 3143(a)(2).  *See id.* at 563.  In particular,

14  Judge Rymer rejected consequences typically associated with a police officer's conviction for criminal

15  civil rights violations as "exceptional reasons" exempting them from mandatory remand.  This included

16  potential civil liability, difficulty in prison, subsequent unemployment, dual prosecution by the state,

17  adverse publicity, and family hardship.  *See id*.

18          The Ninth Circuit doubled down on this premise in *United States v. Garcia*.  This case also

19  involved officers appealing convictions for criminal civil rights violations, this time for conspiring to

20  attack selected inmates in a California prison.  340 F.3d 1013, 1014 (9th Cir. 2003).  The Court declined

21  to fashion an exclusive list of factors for district courts to consider in determining whether a defendant's

22  reasons to delay remand are truly "exceptional" under § 3145(c), instead instructing lower courts to review

23  the totality of the circumstances to determine whether "due to any truly unusual factors or combination of

24  factors (bearing in mind the congressional policy that offenders who have committed crimes of violence

25  should not, except in exceptional cases, be released pending appeal) it would be unreasonable to

26  incarcerate the defendant prior to the appellate court's resolution of his appeal."  *Id*. at 1019.  However,

27  the Court unequivocally rejected the premise that typical and ordinary consequences of conviction meet

28  the threshold for "exceptional:"

1

2

3

4

> [W]e must emphasize that in all cases governed by § 3145(c), the exception applies only where justified by exceptional circumstances.  Hardships that commonly result from imprisonment do not meet the standard.  The general rule must remain that conviction for a covered offense entails immediate incarceration.  Only in truly unusual circumstances will a defendant whose offense is subject to the statutory provision be allowed to remain on bail pending appeal.

5   *Id.* at 1022.  The *Garcia* court remanded for better development of the factual record submitted in support

6   of release, specifically one defendant's serious cancer diagnosis and need for ongoing chemotherapy

7   treatments, which may "render the hardships of prison unusually harsh" for that seriously ill defendant.

8   *Id.* at 1019, 1022.  Other potential factors relevant to exceptionality include: a showing that the defendant's

9   criminal behavior was aberrant, the defendant's prior exemplary life, the length of the prison sentence

10  imposed by the statute of conviction, exceptional risk to the defendant based on incarceration, the nature

11  of defendant's arguments on appeal, and the nature of the defendant's cooperation with the government,

12  if any.  *See id.* at 1019-21.

13        Mendoza cites her performance on pretrial release, responsibilities as mother and caregiver of her

14  two children, and work obligations as reasons why she should not be remanded pending appeal.  ECF No.

15  595 at 2.  These common hardships do not meet the threshold for exceptionality established by *Garcia*.

16  340 F.3d at 1022.  Personal, professional, familial, financial, and educational hardships suffered by

17  incarcerated defendants are the "natural, if unfortunate, consequences" of conviction and incarceration.

18  *See United States v. Christman*, 712 F.Supp.2d 651, 656 (E.D. Ky. 2010).  "It is therefore no surprise that

19  most courts have rejected these hardships as providing an exceptional reason" to delay mandatory remand.

20  *See id.* (collecting cases).   *See also United States v. Burnett*, 76 F.Supp.2d 846, 849 (E.D. Tenn. 1999)

21  (rejecting primary caregiving responsibilities as exceptional reason to delay mandatory remand); *United*

22  *States v. Green*, 250 F.Supp.2d 1145, 1150-51 (E.D. Mo. 2003) (rejecting caregiving responsibilities for

23  nine children, need for continued drug treatment, and attempts to negotiate continued employment after

24  his release from custody as exceptional reasons to delay remand under § 3145(c)).

25        Additionally, the § 3143(b)(1) factors do not support Mendoza's continued release after

26  sentencing.  In particular, she cannot show that her appeal raises substantial questions of law that are *likely*

27  to result in reversal, an order for a new trial, or a sentence that does not include a term of imprisonment.

28  *See* 18 U.S.C. § 3143(b)(1)(B).  This Court denied her motion for a new trial, decisively rejecting her due

1    process and equal protection claims regarding the duress jury instructions.  ECF No. 591.  These claims

2    are unlikely to succeed on appeal given the well-settled law on duress in this circuit.  *See United States v.*

3    *Contento-Pachon*, 723 F.2d 691, 693 (9th Cir. 1984).  Finally, Mendoza's statute of conviction carries a

4    ten-year minimum prison sentence which the Court must impose by law.

5        Accordingly, the Court should deny Mendoza's request and remand her pending appeal.

6    Exceptional means exceptional—uncommon, unforeseeable, and rare.  Mendoza alleges no exceptional

7    circumstances that meet this threshold under the binding and persuasive authorities interpreting it.

8    Mendoza, Contreras, and Anthony are good candidates for self-surrender following imposition of their

9    sentences.  Guizar-Cuellar is already in federal custody and should remain in federal custody for the

10   remainder of his federal sentence.

11   **V.    SENTENCING RECOMMENDATIONS**

12       The Trafficking Victims Protection Act (18 U.S.C. §§ 1591 et seq.) is part of a comprehensive

13   regulatory scheme that criminalizes and attempts to prevent slavery, involuntary servitude, and human

14   trafficking for commercial gain.  Congress has recognized that human trafficking, particularly of women

15   and children in the sex industry, "is a modern form of slavery, and it is the largest manifestation of slavery

16   today." *See United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015); 22 U.S.C. § 7101(b)(1).  In passing

17   the Act, Congress further declared that "sexual slavery and trafficking of women and children

18   are…abhorrent to the principles upon which the United States was founded." *Id*. at § 7101(b)(22).  The

19   Supreme Court has long recognized that the prevention of sexual exploitation and abuse of children is a

20   "government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747, 756 (1982).  The

21   government's sentencing recommendations reflect, first and foremost, the "surpassing importance" of its

22   solemn obligation and prerogative to disrupt, dismantle, and deter all persons and organizations seeking

23   to profit commercially from the sexual exploitation of children.

24       The facts of this case are horrifying.  Over the course of 16 months, these four defendants

25   established and operated an illegal prostitution enterprise that ruthlessly exploited numerous women and

26   children.  Guizar-Cuellar, a celebrated tattoo artist, used his vast social media following to lure poor and

27   vulnerable girls into a hellish vagrancy.  These children were shuttled throughout the Bay Area and

28   sexually abused on a daily basis.  They were isolated from their families and support systems and deprived

of food and sleep.   They were posed naked and in provocative lingerie for online prostitution advertisements.   J.V. was additionally hired out as an exotic dancer and gave dozens of lap dances at sordid cafes.   One of B.M.'s prostitution dates was recorded, and that child pornography video was deliberately circulated online through Instagram and Snapchat to shame B.M. after she initially escaped the defendants and returned home.   Guizar-Cuellar, Mendoza, and Anthony can all be heard on the video clips mocking B.M. for her illness and addiction, body shaming her, laughing at her, and calling her ugly and vile names.   She was 17 years-old at the time these child pornography video clips were created and vindictively distributed.   Defendants were adults in their 20s and 30s.

Guizar-Cuellar and his conspirators saw these girls as resources to exploit and did not care at all about their welfare.   They gave the children cocaine, alcohol, and other substances to keep them compliant. They addicted them to methamphetamine to keep them awake in order to meet nightly profit quotas.   They manipulated J.V. into falsely admitting guilt for Guizar-Cuellar's drug crimes.   They created and distributed child pornography depicting B.M. and created enduring records of the children's sexual exploitation through numerous online advertisements.   Defendants made thousands of dollars from the prostitution of these girls and flaunted that money publicly to recruit more victims to exploit.

These victims were children. They were unprepared and unequipped to cope with sexual trauma and addiction inflicted upon them at such a young age.

"What they did to me, what they did to all of us, they took advantage of us, they manipulated our minds and stole our childhood. We were just kids, most of us came from broken homes or no homes at all, they offered us a chance at more money than we would ever have a chance to have, expensive clothes, purses, jewelry, and we were able to act like we were grown. We had no business acting like we were grown, we were kids, babies to be honest. We did not know what they were doing to us, we didn't know what it would do to the rest of our lives, we didn't know that it would steal our innocence."   Sent. Ex. B, Victim Impact Statement of J.B. at 1.

"I did meth for 2 years straight, had to drop out of high school and that was just rock bottom for me… I only have Guizar to blame. I was a troubled kid and I knew I was his perfect bait."   Sent. Ex. D, Victim Impact Statement of E.T.

"To carry all this hurt I wasn't prepared
Only thing I've ever wanted was to feel and be loved
Ran away to the streets but ended up pimped out and addicted to drugs
My pimp didn't let me eat or sleep til I made $1,000 every day
Trusted him so I told myself it was okay
He dislocated my jaw and beat me almost every day
Not long after I began to be disgusted with myself cause of shit he'd say."
Sent. Ex. E, Untitled Poem by B.M.

"I will never be a normal young adult, I will never be able to be vulnerable to someone, I cannot even bring myself to tell my mom or dad all of what I have been through. I feel like I will forever battle my addictions and my depression and my shame."  Sent. Ex. B, Victim Impact Statement of J.B. at 1.

These victims are loved.  Their mothers are devastated and enraged by the abuse of their daughters and the suffering they were helpless to prevent.

"I lost count of how many times I picked her up from the middle of nowhere. Smelling and hungry, and with her sugar levels very elevated. It was 12 years 24/7 worrying about where she was, or if she was alive!  Sent. Ex. A, Victim Impact Statement of Josefina M. (B.M.'s mother) at 1.

"I was scared out of my mind for my daughter, I was terrified because I didn't know where she was or who she was with or even if she was okay. And to find out many months later, that no [J.B.] was not okay, that you were taking advantage of my young beautiful daughter for your own kicks and there was nothing I could do to stop it. I felt defeated, I felt unbelievably helpless. I was pissed off, I wanted revenge and I wanted blood." *See* Sent. Ex. C. Victim Impact Statement of Rachel N. (J.B.'s mother).

These victims are survivors.  They have shown extraordinary courage and tenacity to overcome their trauma and addiction, mature into productive adults, and testify against their traffickers.  They are determined to help other girls avoid their fate.

"…I know I will somehow, someday get through this and hopefully someday I won't feel the way I feel inside and I will be able to share my story with other young girls so they will know that some monsters don't wear masks and some are even the ones we trust…other young women."  Sent. Ex. B, Victim Impact Statement of J.B. at 2.

"I would not be this strong independent woman I am today if it weren't for this. Now I know my calling is to help other girls like me since I made it, and I can say I came out successfully. I take so much pride in who I am now and this just proves to me I can get over any obstacle. If I can get through this bullshit… I will be able to conquer anything." Sent. Ex. D, Victim Impact Statement of E.T.

"…what I want you to know Ariel, Jocelyn, Araceli and alyssa is…you did not destroy me, you may have badly hurt or damaged me but you did not destroy me. You tried, you almost succeeded but I am still here, I am standing tall and I am happy, I am loved, I am grateful to be alive." Sent. Ex. B, Victim Impact Statement of J.B. at 2.

But not all of these survivors survived this case.  Two self-harmed in their despair.  One died.

> "All you see on my face is fake smiles now
> Feeling like nobody really wants me around
> How do I make this feelin go away
> Please give me a reason I should stay
> I'm getting high nonstop every fuckin day
> Trying to be numb but I still feel the pain
> I'm losing"
>
> Sent. Ex. E., "Fake Smiles Beat" by B.M.

"No counseling, or meds, or therapy were able to rescue her from the hole she was in. She would get deeper and deeper day by day. I lived this for 12 years. Praying and fighting for her to get out of the hole she was in."  Sent. Ex. A, Victim Impact Statement of Josefina M. at 1.

The ones that remain are angry.  They demand justice and accountability.  They are demanding that these defendants face prison for what they have done.

"No amount of money in the world made what you all did to these girls, worth it. You ruined their childhood, you stole so much from them that they can never get back."  Sent. Ex. C. Victim Impact Statement of Rachel N.

"I believe Guizar deserves life in prison…I want this man to live through this misery and reflect everyday on this incident…." Sent. Ex. D, Victim Impact Statement of E.T.

"You do not ever deserve to be free, you deserve to spend the rest of your lives locked in a cage, you do not ever deserve to see your families. And I hope and pray that, that happens. Because we did not deserve to be exploited for your financial gain. One of us will never be able to come back from what you did, one of us will never be able to feel what love truly is, what life was truly meant to be. And you should be held accountable for that. Because had you never met her, she would still be here today." Sent. Ex. B, Victim Impact Statement of J.B. at 2.

This sentencing memorandum is dedicated to these victims and their families.  It centers their narratives, their feelings, and their words.  It is meant to give them a voice—especially those that are not here to speak for themselves.  The defendants will likely spend their sentencing submissions minimizing their own conduct and arguing that their personal problems and traumatic histories outweigh the extraordinary harms they have individually and collectively caused to these victims and this community. The government is intimately familiar with these claims.  They were considered in the sentencing recommendations below along with the other relevant § 3553(a) factors.  But the purpose of this prosecution is to hold these traffickers accountable, not to enable them or make excuses for them.  At bottom, their personal histories and circumstances do not justify their noxious conduct in this case.

## A.    Alyssa Anthony

The government considers Anthony the least culpable of the four defendants charged in this case. She was with the prostitution conspiracy for only a few months—roughly April through July of 2015.  She booked many of the hotel rooms used by the girls and women for prostitution dates throughout the San Jose area.  *See, e.g.*, Gov. Ex. 8.  She also took pictures of and with the minor victims for the prostitution advertisements.  Government's Exhibits 32 and 33 are prostitution advertisements featuring Anthony

(posing as "Angelina") offering two girl sex "specials" with both B.M. ("Diamond") and J.B. ("Serena") in April 2015.  Anthony was also one of the people responsible for distributing a child pornography video of B.M. on Snapchat and Instagram.   J.B. identified Anthony's voice speaking several of the ugly comments directed at B.M. in the online takedowns that followed the distribution of the initial video.

On July 21, 2020, Anthony pleaded guilty to a superseding information charging her with Conspiracy to Commit Sex Trafficking of Children, in violation of 18 U.S.C. § 1594(c).  Prior to her guilty plea, Anthony indicated a willingness to cooperate with the government.  She did three proffer sessions with FBI agents and the U.S. Attorney's Office.  During her proffers, Anthony took responsibility for her actions and acknowledged her culpability for the trafficking of B.M. and assistance with the other two victims until her departure from the conspiracy in July 2015.  She gave a compelling account of the physical and emotional abuse she suffered from Guizar-Cuellar during her time with the conspiracy.  She recounted one incident where Guizar-Cuellar slammed her head into a wall and another where he threw a hot drug pipe at her.  Anthony ultimately did not testify at any hearing or trial on behalf of the government. She received a minor participant departure in her plea agreement in recognition of her lesser culpability. Her final adjusted guidelines range is 57-71 months.

In consideration of the factors above, the government recommends a downward variance for Anthony to a sentence of 24 months' imprisonment, five years of supervised release, restitution, and a $100 special assessment fee.  Under the horrible facts of this case, any non-custodial sentence is wholly unacceptable as a punishment for child sex trafficking and the vindictive distribution of child pornography by an adult (and a parent) who should have known better.  A non-custodial sentence trivializes the extraordinary harms to the dignity, body, and spirit suffered by the minor victims and their families.  It undermines the deterrent effect of this prosecution.  It conveys to these victims, the community, and other traffickers that the prostitution of children is a minor offense meriting a misdemeanor sentence—it is not. The government's recommendation of a low custodial sentence strikes the right balance between accountability for these very serious crimes and Anthony's mitigating facts.

**B.    Jocelyn Contreras**

Contreras is the youngest of the four defendants charged—she was 19 at the time of the offenses. She was pregnant with Guizar-Cuellar's child during much of the federal conspiracy period and had

primary responsibility for managing the logistics of the prostitution enterprise, including the activities of the minor victims when they worked for the defendants.  Contreras booked many of the hotel rooms used for prostitution activities—so many that she was banned from certain places and Anthony had to take over.  She took pictures of the minor victims for prostitution advertisements and worked with Anthony and Mendoza to post and circulate the advertisements on Backpage.com.  Contreras scheduled the prostitution dates with the customers who responded to the online ads, transported the minors to those dates, gave them condoms, and collected the money they earned.  She gave that money to Guizar-Cuellar. She personally benefitted from the profits generated by the trafficking of these girls.

In late January 2016, Contreras traveled with Guizar-Cuellar, Mendoza, and others to Orange County and engaged in further sex trafficking of minor girls and adult women.  Contreras ultimately pleaded guilty to three conspiracy counts based on her participation in the prostitution ring and willful destruction of online and social media records of the conspiracy at Guizar-Cuellar's instruction.  Contreras was sentenced to eight years in state prison, which was suspended.  She cooperated with the state and was placed on supervised probation for five years and given credit for 430 days in jail.  She was then transported to federal court to face charges in this case.

Contreras accepted responsibility for her actions and agreed to cooperate relatively early in her federal case.  She was the first bottom girl to plead guilty to a superseding information charging her with Conspiracy to Commit Sex Trafficking of Children, in violation of 18 U.S.C. § 1594(c).  *See* ECF No. 164.  She had two proffers with the FBI and U.S. Attorney's Office where she gave credible accounts of the inner workings of the conspiracy and the conduct of the participants.  Her pregnancy did not spare her from Guizar-Cuellar's violence.  During a proffer, she recalled that he slapped and hit her while she was pregnant and while she was holding her newborn daughter, once threw a coffee mug at her, and once slammed her head against a car door.  She recalled barricading herself inside a bathroom during one of his rages when the girls were not making enough money from prostitution dates.  Contreras also witnessed Guizar-Cuellar hit and slap Mendoza.

While there were no cooperator provisions in her plea agreement, Contreras nonetheless agreed to testify as a rebuttal witness for the government during Mendoza's trial.  Throughout trial preparation, Contreras corroborated her own testimony and the information she provided with other evidence that she

1   voluntarily offered, including photographs in her phone from specific events discussed.  At trial, Contreras
2   provided valuable insight into the dynamics of the relationships between her co-conspirators.  She also
3   provided both context and perspective regarding the specific and general abuse that the bottom girls and
4   minor victims suffered under Guizar-Cuellar.  Perhaps most importantly, Contreras's consistent and
5   sincere willingness to publicly take responsibility for her actions provided a compelling contrast for the
6   jury to observe and a powerful rebuttal to Mendoza's duress claims that reinforced the government's
7   theory of the case: that, despite any abuse they may have suffered, these bottoms are still responsible for
8   trafficking children and accountable for the harms they have caused.  Contreras was forthright and truthful,
9   and the jury ultimately credited her testimony when it convicted Mendoza.

10          Contreras' final adjusted guidelines range is 97-121 months.  The government moves for an eight-
11   level departure pursuant to USSG § 5K1.1 in recognition of Contreras' substantial assistance to the
12   prosecution through her proffers and trial testimony.  The government supports an additional downward
13   variance based on Contreras' mitigating circumstances.   The government recommends a final sentence
14   of 36 months' imprisonment, five years of supervised release, restitution, and a $100 special assessment
15   fee for Contreras.

16          **C.      Araceli Mendoza**

17          Mendoza was convicted at trial for Conspiracy to Commit Sex Trafficking of Children, in violation
18   of 18 U.S.C. § 371, and Sex Trafficking of Children, in violation of 18 U.S.C. § 1591.  She faces a
19   mandatory minimum of ten years in prison and a maximum of life imprisonment.  She is a CHC II with
20   an adjusted offense level of 39 after an obstruction of justice enhancement for her false testimony at trial.
21   Her final adjusted guidelines range is 292-365 months.

22          Mendoza had a serious and substantive role in the conspiracy.  Like Contreras, she managed and
23   arranged prostitution dates for the minor victims and was primarily responsible for the Backpage accounts
24   that advertised them online.  She booked hotels, distributed condoms, and enjoyed her share of the
25   proceeds generated by prostitution work, which she praised and flaunted on social media.  She distributed
26   the child pornography video of B.M., joining in the ugly commentary.

27          However, the government credits Mendoza's claims of physical and emotional abuse by Guizar-
28   Cuellar.  These claims were independently corroborated by the victims, Mendoza's family members, the

Instagram records, Mendoza's codefendants, and Guizar-Cuellar's conviction for a human trafficking count listing Mendoza as a victim based on his conduct towards her in February 2016.  Mendoza testified at length that Guizar-Cuellar slapped and punched her several times, threatened her with violence, and once hit her in front of her young son.  The government did not contest these claims during Mendoza's cross examination or in argument.  Rather, the government maintains that these abusive incidents do not rise to the level of legal duress, *see Contento-Pachon*, 723 F.2d at 691, and do not exonerate Mendoza from responsibility for sexually exploiting multiple children—which caused significant trauma and lasting harm to those children and their families, as detailed at length above.

The jury rightly convicted Mendoza for her crimes against these exploited children.  However, her infirm duress defense is a permissible basis for departure under the Guidelines.  *See* USSG § 5K2.12.  The government therefore recommends a downward departure and variance to 120 months imprisonment, the statutory minimum sentence for Mendoza's counts of conviction, along with five years of supervised release, restitution, and a $200 special assessment fee.

### D.   Ariel Guizar-Cuellar

Over the life of the federal and state conspiracies, Ariel Guizar-Cuellar has left a trail of broken women, broken children, and broken families in his wake.  His heinous conduct deserves a forceful sanction from this Court for the devastation he has caused to so many.

Guizar-Cuellar sexually exploited numerous women and children.  Guizar-Cuellar was the unquestioned leader, manager, and organizer of this prostitution enterprise and reaped the vast majority of the profits from the sexual labor of these victims—both adults and children.  He personally recruited several women and at least four minor girls into his prostitution enterprises in northern and southern California and ruthlessly exploited all of them.  Guizar-Cuellar manipulated and controlled the women and girls by isolating them from their families and social support systems, addicting them to narcotics to increase their productivity, and using violence and threats of violence to keep them compliant.  He flaunted his unearned wealth across social media, while the sex workers he controlled were hungry, sleep-deprived, sick, and suffering from narcotics withdrawal.  Most never received any of the money they earned.

Guizar-Cuellar sexually abused several children by using them to create child pornography.  The video of B.M.'s sex trafficking, created by Guizar-Cuellar, was only one of many pornographic videos

located on his seized electronic devices, including videos of Guizar-Cuellar engaged in sex acts with Orange County minor victim E.T.  In fact, Guizar-Cuellar offered to sell such videos in Government's Exhibit 12b: "Send me 2000$ I got a lot."  The Supreme Court has repeatedly recognized that "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child."  *United States v. Ferber,* 458 U.S. 747, 758 (1982).  "[A]s a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated.  Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being."  *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249 (2002).

This video, vindictively distributed by Guizar-Cuellar, Mendoza, and Anthony, represents B.M.'s exploitation fivefold.  It not only depicts B.M.'s actual commercial sexual exploitation, but also the rerecording of the exploitation on new devices, its display to jeering spectators, its broadcast to the public, and its further dissemination online.  Worse, since B.M. is now deceased, she will have no opportunity to create new images and videos of her life, her successes, or her happiness to replace these enduring records of her abuse and humiliation.

Guizar-Cuellar was violent and cruel.  Guizar-Cuellar physically assaulted the women and girls he used with frightening regularity, especially towards the end of the conspiracy period when his methamphetamine addiction was at its worst.  In addition to slapping, punching, and shoving his victims, Guizar-Cuellar also burned Anthony with a hot drug pipe, threatened several people with a clothes iron, and abused Contreras and Mendoza in the presence of their own children.  He has criminal convictions for all manner of violent offenses, including fighting in public, human trafficking, pimping, pandering, forcible rape, and forcible sodomy.  *See* Guizar-Cuellar PSR ¶¶ 104, 110.  The facts of this case and his criminal history demonstrate that Guizar-Cuellar is dangerous and volatile.  Protecting the public and deterring his future violence against women and girls are paramount concerns for the government.  *See* 18 U.S.C. § 3553(a)(2)(B) and (C).

Guizar-Cuellar's conduct has ruined many lives.  He deserves the full weight of the Court's condemnation for his violent abuse, relentless exploitation, and blatant theft from these victims.  The government therefore recommends that the Court sentence Guizar-Cuellar to 405 months in prison—the highest possible sentence within the applicable guidelines range in his plea agreement.  Such

recommendations are reserved for the worst offenders we encounter—the most callous and cruel.  Guizar-Cuellar's conduct easily meets that threshold.  In addition, the government recommends a lifetime of supervised release, full restitution to all victims, and a $500 special assessment fee.

The government takes no position on whether the federal sentence should run concurrent, consecutive, or partially consecutive to the 32-year state sentence already imposed for Guizar-Cuellar's Orange County crimes.  However, in reaching that determination the Court may wish to consider the similarities and differences between the federal and state conspiracies, conduct, and victims.  The government opposes all other requests or recommendations for variances or departures on any basis. Guizar-Cuellar is unworthy of leniency in any form.

## VI.     **CONCLUSION**

The government asks that the Court impose the recommended sentences for the reasons stated above.  These tragic events have deeply affected everyone with a connection to this sex trafficking conspiracy and the individuals tangled in its web—including the agents and prosecutors who investigated, charged, and tried this case.  We hope that our prosecution has provided some measure of justice and closure for the victims, their families, and the community.

DATED:          September 2, 2022                          Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


_____/s/_____
MARISSA HARRIS
ANNE C. HSIEH
SARAH E. GRISWOLD
Assistant United States Attorneys