UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ALYSSA ANTHONY,<br>Defendant. | Case No. 16-cr-00150-BLF-4<br><br>**ORDER DENYING DEFENDANT ANTHONY'S MOTION TO WITHDRAW HER GUILTY PLEA**<br><br>[Re: ECF 669] |

On July 21, 2020, Defendant Alyssa Anthony pled guilty to one count of Conspiracy to Commit Sex Trafficking of Children in violation of 18 U.S.C. § 1594(c). More than two years later, on the eve of sentencing, she filed a motion to withdraw her guilty plea. The motion is DENIED for the reasons discussed below.

**I.    BACKGROUND**

*Indictment of Anthony and Co-Defendants in 2016*

In 2016, Anthony and her co-defendants Ariel Guizar-Cuellar, Jocelyn Contreras, and Araceli Mendoza were charged by Indictment with conspiracy to commit sex trafficking of children in violation of 18 U.S.C. § 371 and sex trafficking of children in violation of 18 U.S.C. § 1591. *See* Indictment, ECF 1. Guizar-Cuellar also was charged with sexual exploitation of children in violation of 18 U.S.C. § 2251. *See id.*

The Indictment alleged that the four defendants operated a prostitution venture in San Jose, California, from September 2014 through January 2016. *See* Indictment ¶¶ 12-15. Guizar-Cuellar allegedly recruited teenage girls to work as prostitutes by befriending them through social media,

1    persuading them to travel to San Jose, and then arranging for them to provide sexual services for
2    money.  *See id.*  Mendoza, Contreras, and Anthony allegedly helped with logistics by
3    photographing the girls in their underwear, posting the photographs on "backpage.com" to
4    advertise sexual services, renting hotel and motel rooms for the girls' "dates," monitoring the
5    "dates," and collecting money earned from the "dates."  *See id.*  The Indictment charged this
6    conduct with respect to three teenage victims:  B.M., J.B., and J.V.  *See id.*

*Guilty Pleas Entered by Guizar-Cuellar, Contreras, and Anthony in 2019 and 2020*

In May 2019, Guizar-Cuellar pled guilty to all counts of the Indictment pursuant to a written plea agreement.  *See* Plea Agreement, ECF 144; Criminal Minutes, ECF 145.  Contreras and Anthony later entered into plea agreements as well, Contreras in September 2019 and Anthony in July 2020.  Contreras and Anthony each pled guilty to a single count of conspiracy to commit sex trafficking of children in violation of 18 U.S.C. § 1594(c), as charged in a Superseding Information.  *See* Criminal Minutes, ECF 162, 250; Plea Agreements, ECF 164, 251.  The plea agreements substantially reduced sentencing exposure for Contreras and Anthony, as the conspiracy count charged in the Superseding Information does not carry a mandatory minimum term of imprisonment, while the trafficking counts charged in the original Indictment carry a 10-year mandatory minimum term of imprisonment.

*Trial of Mendoza in 2021*

Mendoza elected not plead guilty and went to trial in September 2021.  The trial lasted three weeks, during which the jury heard testimony from victims J.V. and J.B., who described working as prostitutes for Guizar-Cuellar and having up to ten or fifteen "dates" a night.  *See* Trial Tr. Vol. 2 at 198:8-203:23, 334:6-337:20, ECF 688.  Victim B.M. died shortly before the trial started and so was unable to testify.  However, both J.V. and J.B. testified that B.M. worked as a prostitute for Guizar-Cuellar.  *See* Trial Tr. Vol. 2 at 239:17-242:21, 376:16-380:12, ECF 688.  In addition, the jury was shown a child pornography video of B.M. having sex with a client in a hotel room.  *See* Trial Tr. Vol. 3 at 471:1-476:24, ECF 689.  Two female voices could be heard on the video laughing at and mocking B.M; J.B. testified that female voices were those of Mendoza and Anthony.  *See id.*

1    The jury also heard testimony from law enforcement officers who investigated the
2    prostitution venture.  *See* Trial Tr. Vol. 3 at 451:7-635:24, ECF 689; Trial Tr. Vol. 4 at 664:1-
3    739:21, ECF 690.  Through those witnesses, the Government introduced hotel records, Backpage
4    ads, photographs, videos, Instagram postings, and recorded statements, showing when and how the
5    prostitution venture operated.  *See id*.  Mendoza herself testified at length.  *See* Trial Tr. Vol. 5 at
6    879:10-1013:12, ECF 691; Trial Tr. Vol. 6 at 1023:21-1055:9, ECF 692.  Other witness included
7    experts retained by Mendoza, and her co-defendants Guizar-Cuellar and Contreras.  *See* Trial Tr.
8    Vol. 4 at 784:4-794:6, ECF 690; Trial Tr. Vol. 6 at 1057:1-1162:12, ECF 692; Trial Tr. Vol. 8 at
9    1348:5-1412:9, ECF 694.

10   After eight days of deliberation, the jury returned unanimous guilty verdicts against
11   Mendoza on Count 1 of the Indictment (conspiracy to commit sex trafficking of children) and
12   Count 2 of the Indictment (sex trafficking of B.M.).  *See* Jury Verdict, ECF 545.  The jury hung on
13   Count 3 (sex trafficking of J.B.) and acquitted on Count 4 (sex trafficking of J.V.).  *See id*.  The
14   Government dismissed Count 3 and asked to proceed to sentencing on the unanimous convictions
15   on Counts 1 and 2.  *See* Order Approving Notice of Dismissal, ECF 547.

16   *Sentencing Hearing Scheduled for September 2022*

17   After initially setting sentencing for all defendants in February 2022, the Court granted
18   multiple continuances to accommodate the schedules of counsel, Probation, the victims, and the
19   victims' families.  *See* Criminal Minutes, ECF 554; Orders, ECF 584, 600.  In the end, the Court
20   set a two-day sentencing hearing for September 27, 2022 and September 28, 2022, with the first
21   day reserved for victim impact statements.  Probation prepared presentence reports for all
22   defendants.  *See* PSRs, ECF 618, 619, 630, 631.  The Government submitted an omnibus
23   sentencing memorandum regarding all defendants.  *See* Gov't Mem., ECF 622.  Each of the four
24   defendants submitted a sentencing memorandum.  *See* Def. Mems., ECF 625, 626, 628, 629.

25   Less than a week before the hearing, Anthony retained new counsel advised that she
26   wished to withdraw her guilty plea.  The Court went forward with the victim impact hearing on
27   September 27, 2022.  *See* Criminal Minutes, ECF 646.  Some victim impact statements were read
28   into the record, and family members of victims J.B. and B.M. appeared and addressed the Court.

The Court also went forward with the sentencing of Guizar-Cuellar and Mendoza on September 28, 2022. *See* Criminal Minutes, ECF 647, 652. Guizar-Cuellar was sentenced to a term of imprisonment of 460 months. *See* Criminal Minutes, ECF 647. Mendoza was sentenced to a term of imprisonment of 120 months. *See* Criminal Minutes, ECF 652. The Court deferred sentencing Anthony given her indication that she wished to withdraw her guilty plea, and set a deadline for her to file a formal motion to withdraw the plea. The Court also deferred sentencing Contreras on the ground that she might be needed as a witness in any future trial of Anthony.

*Anthony's Motion to Withdraw Her Guilty Plea in October 2022*

On October 13, 2022, more than two years after entering a guilty plea, one year after conclusion of co-defendant Mendoza's trial, and two weeks after victims' family members traveled to the courthouse for what they thought would be the long-awaited conclusion of this case, Anthony filed a motion to withdraw her guilty plea. *See* Mot., ECF 669. The motion is opposed by the Government. *See* Opp., ECF 699.

Anthony seeks to withdraw her plea on two grounds. First, she claims that her plea was involuntary because she was suffering from Post-Traumatic Stress Disorder ("PTSD") when she entered the plea. Second, even if her plea was voluntary, Anthony contends that she has established a fair and just reason for withdrawal as required under the governing legal standard. Specifically, Anthony asserts that after recently being diagnosed with PTSD and coming to understand how her prior life decisions were impacted by PTSD, she has realized that she wants "to stand up for herself" by defending the charges against her at a jury trial. Mot. at 6. The Court heard argument on November 1, 2022, and determined that an evidentiary hearing was necessary to evaluate Anthony's claim that her plea was involuntary. *See* Minute Entry, ECF 713.

The evidentiary hearing was held on April 4, 2023 and April 5, 2023. *See* Criminal Minutes, ECF 792, 794. Three witnesses testified: Anthony's expert, Dr. Gena Castro Rodriguez, a licensed marriage and family therapist ("LMFT") with expertise in domestic violence, human trafficking, and PTSD; Anthony; and the Government's expert, Dr. Renee Binder, a psychiatrist with expertise in forensic psychiatry, domestic violence, and PTSD. Family members of victim J.B. were present on April 4, 2023 and addressed the Court. A family member of B.M. sent a

4

letter to the Government's counsel, who read the letter into the record on April 5, 2023. After completion of witness testimony, and after hearing from the victims' family members, the Court permitted counsel for each side to make closing remarks. The Court thereafter indicated that it would issue a written decision on Anthony's motion.

## II. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 11, "[a] defendant may withdraw a plea of guilty before sentencing if 'the defendant can show a fair and just reason for requesting the withdrawal.'" *United States v. Yamashiro*, 788 F.3d 1231, 1236-37 (9th Cir. 2015) (quoting Fed. R. Crim. P. 11(d)(2)(B). "A defendant does not always have the right to withdraw a plea because the decision to allow withdrawal of a plea is solely within the discretion of the district court." *United States v. Nostratis*, 321 F.3d 1206, 1208 (9th Cir. 2003). The purpose of Rule 11 is "ensuring some finality at the time pleas are accepted." *United States v. Rios-Ortiz*, 830 F.2d 1067, 1069 (9th Cir. 1987).

"While the defendant is not permitted to withdraw his guilty plea 'simply on a lark,' the 'fair and just' standard is generous and must be applied liberally." *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008) (citation omitted). "[E]ach case must be reviewed in the context in which the motion arose to determine whether, ultimately, a 'fair and just' reason exists." *Id*. Fair and just reasons for withdrawal of a plea "include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *Yamashiro*, 788 F.3d at 1237 (citing *McTiernan*, 546 F.3d at 1167). "Erroneous or inadequate legal advice may also constitute a fair and just reason for withdrawal of a plea." *Id*. "The defendant bears the burden of establishing that withdrawal is warranted." *McTiernan*, 546 F.3d at 1166-67. Even under the liberal standard articulated above, "[o]nce the plea is accepted, permitting withdrawal is, as it ought to be, the exception, not an automatic right." *United States v. Ensminger*, 567 F.3d 587, 593 (9th Cir. 2009).

"[A] defendant does *not* have to prove that his plea is invalid in order to establish a fair and just reason for withdrawal before sentencing." *United States v. Davis*, 428 F.3d 802, 806 (9th Cir. 2005); *see also Ensminger*, 567 F.3d at 591 ("[R]igidly limit[ing] a fair and just reason to only

5

those cases in which the plea is invalid [] applie[s] the wrong legal standard." (internal quotation marks and citation omitted)).  However, a showing that a plea was involuntary, and thus invalid, is a proper ground for withdrawal.  *See Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007).  "The test for determining whether a plea is valid is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Id*. (internal quotation marks and citation omitted).  A defendant may seek to establish that the plea was "coerced, and therefore involuntary." *Id*.; *see also Brady v. United States*, 397 U.S. 742, 750 (1970) ("Of course, the agents of the State may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant.").  A plea also may be involuntary if it was induced by misrepresentations of defense counsel as to what the sentence would be under the plea agreement.  *See Chizen v. Hunter*, 809 F.2d 560, 562-63 (9th Cir. 1986).  "To determine the voluntariness of the plea, we look to the totality of the circumstances, examining both the defendant's subjective state of mind and the constitutional acceptability of the external forces inducing the guilty plea." *Doe*, 508 F.3d at 570 (internal quotation marks and citation omitted).

### III. DISCUSSION

Anthony seeks to withdraw her guilty plea on two grounds.  First, she claims that her plea was involuntary because she was suffering from PTSD when it was entered.  Second, she claims that even if her plea was voluntary, she has established a fair and just reason for withdrawal.  Anthony asserts that her diagnosis of PTSD, and her new insight into the effect PTSD has had on her past decisions, constitute intervening circumstances that warrant withdrawal of her plea under the fair and just reason standard set forth above.  In opposition, the Government argues that Anthony has not met her burden to prove that her plea was involuntary.  The Government also argues that Anthony's PTSD diagnosis and new-found insight do not constitute intervening circumstances under the fair and just reason standard.

Below, the Court identifies the evidence it has considered in ruling on Anthony's motion, and then addresses Anthony's claims that her guilty plea was involuntary and that she has shown a fair and just reason to withdraw her guilty plea.

6

**A.     Evidence Considered by the Court**

    **1.     Documents**

The parties submitted a number of documents in connection with Anthony's motion, most of which have been considered by the Court. The documents considered by the Court include: Anthony's declaration (ECF 669-1); criminal records of Anthony's former partner Phillip Rios (ECF 669-5); the declaration of Sharon Dhanoa, the Director of the South Bay Coalition to End Human Trafficking (ECF 669-3); the report of Anthony's expert, Dr. Gena Castro Rodriguez (ECF 668-3); 302 Reports of proffer sessions that Anthony had with law enforcement (ECF 700-2); the declaration of the Government's counsel, Marissa Harris (ECF 700-1); excerpts of trial testimony (ECF 702-3, 702-5); 302 Reports of proffer sessions that victims J.V., J.B., and B.M. had with law enforcement (ECF 702-4, 702-6, 702-7); and the report of the Government's expert, Dr. Renee Binder (admitted as Exhibit 1 at the evidentiary hearing).

Anthony submitted additional documents that have not been considered by the Court. She submitted a declaration of her prior counsel, Robert Carlin (ECF 669-2), but orally withdrew Mr. Carlin's declaration on the record at the evidentiary hearing. Anthony also submitted a report from a previously undisclosed psychiatric expert, Dr. Laurie Richer (ECF 788-3). At the start of the evidentiary hearing, the Court questioned Anthony's counsel about the report and was advised that Dr. Richer had been retained at the last minute and had prepared a report but was not available to testify. The Government objected to Dr. Richer's report, pointing out that the Government had been given only one business day to review the report and that Dr. Richer's qualifications and opinions could not be tested since she was not available to testify. The Court found the Government's objections to be well-taken and issued a ruling on the record that Dr. Richer's report would not be considered. Given that ruling, Dr. Richer's report is stricken and Anthony's motion to submit the report under seal (ECF 788) is terminated as moot.

    **2.     Statements of Victims' Family Members**

Family members of victim J.B. addressed the Court during the evidentiary hearing, and a letter from a family member of victim B.M. was read into the record. The Court will consider those statements as part of the Government's showing of prejudice that would result from having a

second trial in this case. *See United States v. Vasquez-Velasco*, 471 F.2d 294, 294 (9th Cir. 1973) ("Prejudice to the government is one factor to be considered by the district court in its evaluation of the merits of the defendant's motion to withdraw his plea."). The Court advised counsel at the hearing that it would consider the family members' statements for that limited purpose, and no objection was raised.

### 3. Testimony

The Court heard testimony from Dr. Castro Rodriguez, Anthony, and Dr. Binder. The Court has considered the testimony of those three witnesses, which is summarized below.

#### a. Testimony of Dr. Castro Rodriguez

Anthony sought to establish her diagnosis of PTSD through the expert testimony of Dr. Castro Rodriguez. Dr. Castro Rodriguez testified that she is a LMFT with expertise in interpersonal trauma and survivors of crimes such as domestic violence, sexual assault, and human trafficking. She was retained by Anthony's counsel to conduct a mental health evaluation of Anthony. Dr. Castro Rodriguez conducted the requested mental health evaluation of Anthony in approximately eight hours over several days in April 2022 and May 2022. The evaluation was done over Zoom due to the COVID-19 pandemic. Dr. Castro Rodriguez used three tools: the PCL-5, which is an assessment for PTSD, the Beck depression inventory, and the Beck anxiety scale. Dr. Castro Rodriguez concluded that Anthony met the criteria for a provisional diagnosis of PTSD, and also met the criteria for moderate depression and moderate anxiety.

The Government challenged Dr. Castro Rodriguez's qualifications to diagnose Anthony with PTSD, asserting that in California a LMFT does not have authority to diagnose mental disorders. Government counsel cited California Business & Professions Code § 4980.02, the statue governing licensure of LMFTs, which lists the acts a LMFT may perform, including assessment, evaluation, prognosis, treatment, and psychotherapy. *See* Cal. Bus. & Prof. Code § 4980.02. The statute does not list diagnosis as an act that may be performed by a LMFT. *See id.* Government counsel contrasted § 4980.02, governing LMFTs, with California Business & Professions Code § 2903, governing licensure of psychologists. *See* Cal. Bus & Prof. Code § 2903. The latter statute expressly lists diagnosis as an act that may be performed by a licensed

psychologist. *See id.* In response, defense counsel argued that the governing statutes do not expressly preclude a LMFT from diagnosing mental disorders, that the statutes create a gray area as to whether a LMFT may diagnose mental disorders, and that LMFTs do diagnose mental disorders in California. Defense counsel asserted that the California Marriage and Family Therapists' Association, a professional organization of LMFTs, has taken the position that LMFTs may diagnose and treat mental disorders. Defense counsel also argued that those services are reimbursed by California's Medi-Cal program and private insurance. Dr. Castro Rodriguez testified that is her understanding that LMFTs can diagnose mental disorders in California. The Court allowed Dr. Castro Rodriguez to testify but indicated that the Government could revisit her qualifications to make a diagnosis later in the hearing.

With respect to the provisional diagnosis of PTSD, the first criterion considered by Dr. Castro Rodriguez was that Anthony had suffered incidences of trauma, including being sexually trafficked. The second criterion was that Anthony displayed symptoms associated with PTSD, including avoidance, intrusive thoughts, and hypervigilance. Dr. Castro Rodriguez explained that victims of sex trafficking or trauma commonly will engage in avoidance behavior, trying to stay away from things that might trigger them. Based on Anthony's self-reporting, Dr. Castro Rodriguez opined that Anthony had engaged in avoidance behavior by trying to avoid talking about the trial and by using substances to numb her feelings. Dr. Castro Rodriguez also stated that Anthony reported intrusive thoughts of shame, self-blame, and hopelessness, as well as hypervigilance that manifested as an inability to settle down or focus. Finally, Dr. Castro Rodriguez testified that Anthony reported past symptoms of dissociation, meaning feeling outside of her body, feeling unconnected to her body, and feeling as if things were unreal.

Based on the history of abuse that Anthony reported, and the symptoms that Anthony described, Dr. Castro Rodriguez concluded that Anthony was suffering from "complex trauma" or "complex PTSD" arising from multiple incidents of trauma. Dr. Castro Rodriguez distinguished that condition from PTSD arising from a single incident. According to Dr. Castro Rodriguez, this "complex trauma" has caused Anthony to be in a perpetual survival mode where she constantly perceives herself to be in danger. Dr. Castro Rodriguez also found Anthony's behavior consistent

9

1   with "learned helplessness," a condition that causes people to lose their motivation and ability to
2   protect themselves because they have not been able to protect themselves in the past.

3   Dr. Castro Rodriguez testified that she reviewed her findings with Anthony and tried to
4   help Anthony understand that she was suffering predictable symptoms for someone who has
5   experienced the type of trauma that Anthony described.  Dr. Castro Rodriguez stated that hearing
6   those findings was validating for Anthony and helped her understand some of her own past
7   decisions and behaviors.  Dr. Castro Rodriguez did not develop a treatment plan for Anthony or
8   actually treat her; Dr. Castro Rodriguez's role was solely to perform a mental health evaluation.

9   After Dr. Castro Rodriguez performed the mental health evaluation of Anthony and
10  reviewed those findings, she was given access to police reports involving Anthony's partner,
11  Phillip Rios.  The police reports described incidents of Rios' domestic violence against Anthony.
12  Dr. Castro Rodriguez was not aware of the domestic violence when she evaluated Anthony, but
13  she did not find Anthony's failure to mention the domestic violence to be surprising because in her
14  experience survivors of domestic violence often do not disclose the violence out of shame and
15  self-doubt.  Dr. Castro Rodriguez did not feel that the undisclosed domestic violence undermined
16  her provisional diagnosis of PTSD and in fact indicated that Anthony was still in survival mode at
17  the time of the evaluation.

18  On cross-examination, Government counsel clarified with Dr. Castro Rodriguez that the
19  gold standard for diagnosis of PTSD is a structured clinical interview and that Dr. Castro
20  Rodriguez had not conducted such a clinical interview of Anthony.  Dr. Castro Rodriguez instead
21  used the PCL-5, a screening tool for PTSD, and relied entirely on Anthony's self-reporting and
22  notes of Anthony's attorney.  Based on that self-reporting, Dr. Castro Rodriguez concluded that
23  Anthony had suffered from dissociative episodes but she did not describe what that entailed and
24  she did not personally observe Anthony in a dissociative state.  At the time she evaluated
25  Anthony, Dr. Castro Rodriguez was not given the police report of Rios' domestic violence, the
26  302 Reports of proffer sessions that Anthony had with law enforcement, Anthony's plea
27  agreement, or a transcript of Anthony's plea colloquy.  Dr. Castro Rodriguez was not asked to,
28  and did not, opine regarding the voluntariness of Anthony's guilty plea, which was taken two year

before Dr. Castro Rodriguez evaluated Anthony. Finally, Dr. Castro Rodriguez testified that PTSD, domestic violence, and trauma do not necessarily prevent individuals from making decisions for themselves. She stated that many persons suffering from PTSD, including survivors of domestic violence and trauma, retain free will and legal agency to make decisions in their lives.

On redirect, Dr. Castro Rodriguez stated that in fact she could not definitely say that Anthony suffered any dissociative symptoms, and that mainly it appeared that Anthony engaged in avoidance and self-blame. Dr. Castro Rodriguez reiterated that Anthony appeared to be in survival mode, making decisions moment-to-moment while being unable to consider the ultimate consequences of her actions.

### b. Testimony of Anthony

Anthony testified regarding her involvement in the prostitution enterprise, stating that she was solely a victim of her co-defendant Guizar-Cuellar and not a co-conspirator. She stated that when she was arrested, she told the police everything that Guizar-Cuellar had done to her, but the police did not view her as a victim. She described being short of breath and tearful when she had to sit next to Guizar-Cuellar in court proceedings, and explained that she would get pictures in her mind of everything she suffered while involved in the prostitution enterprise. She also reacted strongly to certain smells, such as the smell of hotel sheets, and she had nightmares. Anthony testified that she drank alcohol and smoked marijuana to try to shut her mind down, even though she knew that conduct violated her pretrial release conditions. She was in a romantic relationship with Phillip Rios during that period, which she characterized as abusive. However, she stayed in the relationship because it was a distraction from what she had suffered from Guizar-Cuellar and from ongoing court proceedings.

Anthony stated that she decided to accept the Government's offer of a plea agreement, and to plead guilty, so that the court proceedings would end and the pain would go away. She testified that looking back, with her newfound knowledge that she was suffering from PTSD, she does not believe that her guilty plea was voluntary. Specifically, Anthony indicated that Dr. Castro Rodriguez helped her understand that many of her prior decisions were due to PTSD. After receiving her PTSD evaluation, Anthony began going to counseling for substance abuse and

11

mental health treatment. She now feels stronger and she wants to fight for herself and tell her story, even if that means that the charge carrying a 10-year mandatory minimum term of imprisonment is reinstated. Anthony stated that even if she is convicted and sentenced to a 10-year term of imprisonment, she will be mentally free.

On cross-examination, Anthony testified that she is the mother of five children and that the three youngest, aged one, five, and six, live at home with her in an apartment that she rents. She supervises the children and takes the five-year-old and six-year-old to a daycare that she selected. She pays the rent each month, takes online college classes with the goal of becoming a registered nurse, and hopes to go into trauma care.

Anthony conceded that she entered into her plea agreement while represented by counsel and after a prolonged period of negotiation between 2017 and 2020. Anthony testified that during the negotiation period she had three proffer sessions with the Government, which were recorded in 302 Reports, during which she provided information regarding recruitment of the minor victims into the conspiracy and admitted to various conduct including making hotel reservations for the minor victims' prostitution dates, being present at some of those prostitution dates, taking pictures of minor victims, and posting a video online of a minor victim being trafficked. After completion of those proffer sessions, and as a result of negotiations between Anthony's counsel and the Government's counsel, the Government offered Anthony a plea agreement under which she would plead guilty to a single charge of conspiracy that did not carry any mandatory minimum sentence. Anthony understood that under the terms of the plea agreement, she could request a no-jail sentence. Anthony stated that she reviewed the plea agreement before signing it, and that she requested and approved certain edits to clarify that: she was recruited into the conspiracy in April 2015 rather than January 2015, she facilitated dates of minors but did not arrange the dates, and she took pictures of the minors for online ads but did not post the online ads. After the Government made Anthony's requested edits, she signed the plea agreement on July 8, 2020.

When Anthony decided to withdraw her guilty plea two years later, she did so with the support of Sharon Dhanoa, who is the Director of the South Bay Coalition to End Human Trafficking. Ms. Dhanoa helped Anthony communicate her desire to withdraw her plea to her

court-appointed lawyer. Ms. Dhanoa also arranged for Anthony to be interviewed by the Los Angeles Times, in an article that characterizes the Government attorneys as misogynists for being female prosecutors in this case.

On redirect, Anthony stated that she did not conspire with Guizar-Cuellar, that she did not control the plea negotiations, and that Ms. Dhanoa did not pressure her into withdrawing her guilty plea.

### c. Testimony of Dr. Binder

The Government presented the testimony of its expert, Dr. Binder, a psychiatrist with expertise in forensic psychiatry, domestic violence, and PTSD. Dr. Binder is a professor of psychiatry at U.C.S.F. Medical School and former President of the American Psychiatric Association. Dr. Binder was retained by the Government to review and comment on the opinions of Dr. Castro Rodriguez; Dr. Binder did not meet with or conduct an independent evaluation of Anthony.

Dr. Binder first opined that Dr. Castro Rodriguez is not qualified to diagnose Anthony with PTSD because she is not a licensed psychologist. In Dr. Binder's view, LMFTs are not permitted within the scope of their practice to make a diagnosis of mental disorder. That view is based on Dr. Binder's understanding that the California statute governing psychologists expressly includes diagnosis within the scope of the licensure, while the statute governing LMFTs excludes the word diagnosis from the scope of the licensure.

Dr. Binder next opined that Dr. Castro Rodriguez's diagnosis of PTSD does not comport with the authoritative text on mental disorders, the Diagnostic and Statistical Manual ("DSM"). That text is published by the American Psychiatric Association, of which Dr. Binder is a former president. According to Dr. Binder, Dr. Castro Rodriguez did not apply the DSM criteria, relied on insufficient data, and improperly used screening instruments to make the diagnosis. Specifically, Dr. Binder noted that Dr. Castro Rodriguez used the PCL-5 to diagnose PTSD, when the PCL-5 is merely a screening tool that can give rise to a provisional PTSD diagnosis that would need to be confirmed with clinical follow-up. Dr. Binder stated that she would expect to see a mental status exam used for a proper diagnosis of PTSD, and that Dr. Castro Rodriguez did not

perform such an exam. Instead, Dr. Castro Rodriguez made general statements, such as that Anthony suffered dissociative experiences, but appeared to be using terminology incorrectly. According to Dr. Binder, the term dissociative experiences refers to flashbacks, as a veteran feeling that he is back in the trenches, which last at most a few seconds or minutes. In short, Dr. Binder stated that after reviewing Dr. Castro Rodriguez's report, she (Dr. Binder) cannot confirm whether or not Anthony has PTSD.

Moreover, Dr. Binder stated that even a supported diagnosis of PTSD would not prevent Anthony from making important decisions. Dr. Binder testified that a diagnosis of PTSD and functional ability are two separate issues. When asked what symptoms of PTSD could impair an individual's ability to plead guilty, Dr. Binder indicated that someone in an acute dissociative state – meaning in the midst of a flashback – would not be able to make a decision. She stated that the DSM describes an acute dissociative state as lasting several seconds, and that she has heard people describe such episodes as lasting several minutes. Dr. Binder was clear that a dissociative state could not last an entire day, or weeks, or months. When asked about Anthony's claim that her guilty plea was "an automatic avoidance defense mechanism," Dr. Binder stated that "an automatic avoidance defense mechanism" is not a recognized psychiatric concept and is not a symptom of PTSD. When asked about Dr. Castro Rodriguez's suggestion that Anthony's plea was a result of learned helplessness, Dr. Binder explained that the concept of learned helplessness originated from an experiment in which dogs were shocked when they tried to escape until eventually the dogs stopped trying to escape because they learned there was no point. In humans, the phrase is used to describe feelings of passivity in the face of difficult circumstances. Dr. Binder opined that people with learned helplessness can still make reasoned decisions, and cited to record evidence that Anthony was not simply passive but was engaged in the plea negotiations.

After reviewing the transcript of Anthony's plea colloquy, and the record of negotiations lasting several months, Dr. Binder opined that Anthony's guilty plea could not have been the result of dissociative episodes. It is Dr. Binder's view that Anthony's guilty plea was a rational choice among several courses of action. Dr. Binder stated that Anthony's given reason, that she just wanted it to be over, was a good reason for not going to trial. Dr. Binder also observed that

14

Anthony clearly was triggered when testifying at the evidentiary hearing, but still was able to hear the questions and respond coherently.

On cross-examination, Dr. Binder stated that when forming an opinion regarding Anthony's mental state at the time of her plea, she (Dr. Binder) relied in part on emails between Anthony's counsel and Government counsel. Defense counsel challenged Dr. Binder's reliance on correspondence between individuals who were not Anthony, and in response Dr. Binder explained that when evaluating someone's past mental state she looks for contemporaneous sources of information. So she relied on emails from Anthony's counsel, which reflected that Anthony was "on board" with the plea after certain edits were made, and that Anthony wanted to plead and accept responsibility for her part. She also relied on the transcript of the change of plea hearing. Dr. Binder determined that when evaluating Anthony's mental state at the time of her 2020 change of plea, evidence regarding statements she made in 2020 was more reliable than Anthony's 2022 declaration drafted two years after the fact.

On redirect, Dr. Binder reiterated that since she was not given access to Anthony herself, and had to provide an opinion regarding Anthony's mental state at the time of her plea in 2020 based on limited written materials, she relied primarily on evidence that was contemporaneous with the 2020 plea. That evidence included emails between Anthony's counsel and Government counsel negotiating the plea agreement and Anthony's plea colloquy. Based on all of the documents provided to her, Dr. Binder formed the opinion that Anthony had suffered quite a bit of trauma in her life, and that she may or may not have PTSD, but that she was able to make a reasoned decision when she pled guilty.

The Court then asked Dr. Binder about the 36-minute plea colloquy, as documented by the reporter's transcript. The change of plea hearing was conducted telephonically due to the COVID-19 pandemic, so the Court was not able to observe Anthony's demeanor. However, the transcript of the telephonic hearing made clear that Anthony provided prompt, cogent responses to the Court's questions. Dr. Binder testified that Anthony would not have been able to do so had she been experiencing a dissociative state, or flashback. Dr. Binder opined that had Anthony been in a dissociative state during the plea colloquy, she would have asked to have questions repeated, or

15

taken long pauses, or otherwise indicated that she was in distress.

Having clarified what evidence it has considered, the Court turns to Anthony's asserted grounds for withdrawal of her guilty plea.

### B. Anthony's Claim that her Guilty Plea was Involuntary

Anthony claims that her guilty plea was involuntary because she was suffering from PTSD when it was entered. As set forth above, "[t]he test for determining whether a plea is valid is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Doe*, 508 F.3d at 570 (internal quotation marks and citation omitted). "To determine the voluntariness of the plea, we look to the totality of the circumstances, examining both the defendant's subjective state of mind and the constitutional acceptability of the external forces inducing the guilty plea." *Id.* (internal quotation marks and citation omitted).

#### 1. Anthony's Subjective State of Mind

Anthony's claim of involuntariness has evolved somewhat between the filing of her motion to withdraw and the close of the evidentiary hearing. In her written motion, Anthony claimed that when she entered her guilty plea she was suffering from PTSD stemming from childhood sexual abuse and being sex trafficked by Guizar-Cuellar, and also was experiencing trauma due to ongoing domestic violence at the hands of her then-partner Phillip Rios. *See* Mot. at 14-16. Anthony argued that as result of her PTSD, the plea negotiations in this case caused a "trauma response" that impaired her ability to make a reasoned choice to plead guilty. *See id.* at 14-15. She also argued that "[a] person currently experiencing domestic violence cannot knowingly and voluntarily enter a plea because the trauma response to current abuse significantly affects cognition." *Id.* at 16.

At the hearing, Anthony's counsel abandoned the assertion that a person with PTSD and/or a person suffering from domestic violence can never make a rational decision to plead guilty. Anthony's counsel acknowledged that many people suffering from PTSD do make rational decisions throughout their lives. Counsel indicated that Anthony was seeking a narrower ruling than that originally sought in her written motion, in particular, a ruling that *Anthony* was unable to make a voluntary decision to enter a guilty plea given her history of trauma and resulting PTSD.

16

Anthony relies on the opinion of Dr. Castro Rodriguez to establish her diagnosis of PTSD. As discussed above, the parties disagree as to whether a LMFT like Dr. Castro Rodriguez is qualified to diagnose PTSD under California law. After reviewing the California statutes cited by the parties and the opinions of Dr. Castro Rodriguez and Dr. Binder, the Court finds that it is unclear whether a LMFT may diagnose a mental disorder in California. However, for purposes of this motion, the Court is prepared to accept Dr. Castro Rodriguez's provisional diagnosis of PTSD based on her use of the PCL-5 screening tool and eight hours of consultation.

The provisional diagnosis of PTSD does not establish that Anthony's plea was involuntary, however. Both Dr. Castro Rodriguez and Dr. Binder testified that many individuals suffering from PTSD, including survivors of domestic violence and trauma, retain the ability to make reasoned decisions in their lives. Anthony claims that she was not able to make a reasoned decision to plead guilty because she was in a dissociative state, because her guilty plea was an automatic avoidance defense mechanism, and because she was suffering from learned helplessness. However, the record evidence does not support Anthony's claim that she was in a dissociative state when she entered her plea. Dr. Castro Rodriguez testified that she could not say whether or not Anthony was in a dissociative state. Dr. Binder testified that a dissociative state would last seconds or at most minutes, and would be evidenced by lengthy pauses, "ums," or an inability to track. The transcript of the 36 minute plea hearing contains none of these indicators of a dissociative state. To the contrary, the transcript reflects that Anthony understood and promptly responded to all of the questions posed by the Court. Dr. Binder testified credibly that an "automatic avoidance defense mechanism" is not a recognized concept. Dr. Binder also testified credibly that the evidence did not reflect that Anthony was suffering from learned helplessness, and that in any event individuals suffering from learned helplessness may nonetheless make reasoned decisions.

The record reflects that Anthony engaged in a lengthy negotiation with the Government that lasted months, during which she participated in three proffer sessions and actively participated in the fine tuning of her plea agreement. During that process, she was ably represented by competent counsel. She responded cogently during the change of plea hearing. "Although it is

17

difficult to probe the highly subjective state of mind of a criminal defendant, the best evidence of his understanding when pleading guilty is found in the record of the Rule 11 colloquy." *United States v. Jimenez-Dominguez*, 296 F.3d 863, 869 (9th Cir. 2002). Based on this evidence, the Court concludes that Anthony was capable of making a reasoned decision to plead guilty notwithstanding her trauma and resulting PTSD.

### 2. Constitutional Acceptability of the External Forces

Anthony does not seriously argue that her guilty plea was the result of any constitutionally unacceptable external forces. She does not claim that anyone elicited her plea "by actual or threatened physical harm or by mental coercion." *See Brady*, 397 U.S. at 750. Anthony does suggest that she entered her plea "under coercive circumstances including but not limited to the threat of a 10-year mandatory minimum sentence that would separate her from her children." Reply at 2, ECF 701. However, a plea is not invalid because the government charges a particular crime or accumulates evidence, even if those are motivating factors. The Supreme Court rejected that notion in *Brady*:

> The State to some degree encourages pleas of guilty at every important step in the criminal process. For some people, their breach of a State's law is alone sufficient reason for surrendering themselves and accepting punishment. For others, apprehension and charge, both threatening acts by the Government, jar them into admitting their guilt. In still other cases, the post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family. All these pleas of guilty are valid in spite of the State's responsibility for some of the factors motivating the pleas; the pleas are no more improperly compelled than is the decision by a defendant at the close of the State's evidence at trial that he must take the stand or face certain conviction.

*Brady*, 397 U.S. at 750.

Accordingly, the Court finds that Anthony's plea was not rendered involuntary by any constitutionally unacceptable external forces.

Anthony has the burden to prove that her plea was involuntary. She has not met that burden, as she has not shown that her trauma and PTSD rendered her incapable of making a reasoned decision to plead guilty, or that her plea was rendered involuntary by constitutionally unacceptable external forces.

18

### C. Fair and Just Reason for Withdrawal

Anthony claims that even if her plea was voluntary, she has established a fair and just reason for withdrawal. As noted above, fair and just reasons for withdrawal of a plea "include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea." *Yamashiro*, 788 F.3d at 1237 (citing *McTiernan*, 546 F.3d at 1167). "Erroneous or inadequate legal advice may also constitute a fair and just reason for withdrawal of a plea." *Id*.

Anthony does not challenge the adequacy of the plea colloquy or the legal advice of counsel. Nor does she assert that withdrawal is warranted by newly discovered evidence. She contends that her diagnosis of PTSD, and her new insight into the effect PTSD has had on her past decisions, constitute intervening circumstances that warrant withdrawal of her plea. Anthony has not cited a single case in which withdrawal of a guilty plea was granted based on this type of self-discovery. Even crediting fully Dr. Castro Rodriguez's provisional diagnosis of PTSD, and Anthony's testimony regarding her newfound clarity, it appears that at most Anthony has shown a good faith change of heart regarding her decision to plead guilty.

A defendant may not withdraw a guilty plea "whenever the defendant has a good faith change of heart." *United States v. Rios-Ortiz*, 830 F.2d at 1069. "Where, as here, the district court fully complied with Rule 11's requirements, the result should be more than ephemeral." *Id*. at 1070. Allowing a defendant "to withdraw his guilty plea merely because he changed his mind would undermine Rule 11's purpose and reduce plea proceedings to a time-consuming formality with no lasting effect." *Id*. Accordingly, "a change of heart – even a 'good faith change of heart' – is not a fair and just reason" entitling a defendant to withdraw a guilty plea, "even where the government incurs no prejudice." *Ensminger*, 567 F.3d at 593.

Here, the Government *would* suffer prejudice if Anthony were permitted to withdraw her plea. The Government already conducted a lengthy trial of Mendoza, the only defendant who did not enter a guilty plea. That trial required the Government to expend substantial time and resources. The evidence presented to the jury included documents, video clips, and testimony from numerous witnesses, including two of the victims. The victims' families attended the trial

19

and related court proceedings, seeking closure.  To require the Government to try essentially the same case against another of the defendants, and to put the victims and their families through another trial based on Anthony's change of heart – even if in good faith – would not be fair and just.

The Court recognizes that Anthony has made positive changes in her life with the aid of Dr. Castro Rodriguez and a supportive community.  She appears to feel that withdrawing her guilty plea would be another positive step in her personal journey.  However, Anthony's desire to set aside a plea agreement that she now views through a different lens does not satisfy her burden to show a fair a just reason for withdrawal.

**IV.   ORDER**

(1) Defendant Anthony's motion to withdraw her guilty plea is DENIED.

(2) The parties shall contact the Courtroom Deputy Clerk for the next available dates for sentencing of Defendants Anthony and Contreras, and shall submit a stipulation and proposed order setting a sentencing date.

(3) This order terminates ECF 669.

Dated:  May 8, 2023

_____
BETH LABSON FREEMAN
United States District Judge